**TOPKIS BROTHERS COMPANY**
v.
**The UNITED STATES.**
No. 391–57.

United States Court of Claims.
Dec. 6, 1961.

Samuel F. Schwag, Philadelphia, Pa., for plaintiff.

Edna P. Goldberg, Washington, D. C., with whom was William H. Orrick, Jr., Asst. Atty. Gen., for defendant.

JONES, Chief Judge.

Plaintiff Topkis Brothers Company, a clothing manufacturer, seeks reimbursement by way of an equitable adjustment in the contract price for increased costs of production and loss of profit because of defendant's alleged failure to supply suitable Government-furnished property. Defendant counterclaims for savings allegedly realized by plaintiff in the performance of its agreement.

On November 9, 1951, defendant's New York Quartermaster Procurement Agency issued an invitation for bids pursuant to which the Government sought to procure 3,802,980 field jackets, sateen, OD–7. On the basis of its responsive bid to defendant's invitation, plaintiff was awarded two contracts on December 21, 1951, numbered DA–30–280–QM–22839 and DA–30–280–QM–22848. The former contract called for delivery of 700,000 jackets at unit prices ranging from $0.545 to $0.599, for a total contract price of $398,900, while the latter called for delivery of 300,000 jackets at unit prices of from $0.519 to $0.535, for a total contract price of $157,300. Deliveries under both contracts were to be made in designated monthly quantities, with performance

under both to be completed by August of 1952.

Except for the unit prices and quantities involved, the terms and conditions of each contract were identical in all material respects. The jackets were to be manufactured by plaintiff in strict compliance with defendant's specification MIL–J–3001A, which is fully set forth in finding 10. Defendant undertook to furnish plaintiff with the requisite cloth for the manufacture of the jackets, the government-furnished cloth being described in defendant's invitation for bids as "Cloth, Cotton, Sateen, 8.5 oz., OD–7."

Although no specification concerning the manufacture of the sateen cloth was mentioned in the contracts, there was in existence at the time of the issuance of defendant's invitation for bids a Government military specification controlling the manufacture of cotton, sateen cloth. This specification, which by its terms superseded MIL–C–10296, dated May 9, 1950, was MIL–C–10296A, dated May 10, 1951, covering "Cloth, Cotton, Sateen, Carded." The pertinent provisions of each of the above specifications are fully set forth in finding 8.

In connection with defendant's undertaking to supply plaintiff with the necessary "Cloth, Cotton, Sateen, 8.5 oz., OD–7" for the manufacture of the field jackets, each of the contracts provided in pertinent part as follows:

"29. Government-Furnished Property.—(a) The Government shall deliver to the Contractor, for use in connection with and under the terms of this contract, the property which the schedule or the specifications state the Government will furnish (*hereinafter referred to as "Government-Furnished property"*). The delivery or performance dates for the supplies or services to be furnished by the Contractor under this contract are based upon the expectation that Government-Furnished property of a type suitable for use will be delivered to the Contractor at the times stated in the schedule or if not so stated in sufficient time to enable the Contractor to meet such delivery or performance dates. * * * The Government shall not be liable to the Contractor for damages or loss of profit by reason of any delay in delivery of or failure to deliver any or all of the Government-Furnished property, except that in case of such delay or failure upon the written request of the Contractor, an equitable adjustment shall be made in the delivery or performance dates, or price, or both, and in any other contractual provision affected thereby, in accordance with the procedures provided for in the clause of this contract entitled "Changes."

* * * * * *

"2. Changes.—The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: *Provided, however,* That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under

this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled 'Disputes.' However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.

\* \* \* \* \* \*

"12. Disputes.—Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: *Provided,* That if no such appeal is taken, the decision of the Contracting Officer shall be final . and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision."

Plaintiff received its first shipment of the Government-furnished sateen cloth under these contracts on February 9, 1952. Upon commencing production in accord with the method specified in the invitation for bids, i. e., specification MIL–J–3001A, plaintiff immediately experienced sewing difficulties. Although there is no doubt that the cloth conformed to the applicable specifications controlling its manufacture, nonetheless its finish was so "hard" and lacking in flexibility that it resisted adjusting to the shape to be provided by the $\frac{3}{16}$-inch folders with which plaintiff's machines were equipped. As a result, the cloth was not adequately folded together on the requisite double stitching operations, thereby causing raw edges of the cloth to remain exposed after such operations. Similarly, on both single and double stitching operations, the stiffness of the cloth resulted in cloth fracture, needle burning, thread breakage, and malformed stitching.

Plaintiff's machinists endeavored to solve the problems thus encountered but without success, and plaintiff finally found it necessary to call upon the Singer Sewing Machine Company for advice. Singer machinists recommended, and plaintiff accomplished, the installation of $\frac{1}{4}$-inch folders on all of its double stitching machines. (It is to be noted that, in order to enlarge the basis of bidding on the invitation for bids, defendant's specifications controlling the manufacture of the jackets provided for a range of $\frac{3}{16}$-to $\frac{5}{16}$-inch gage on double stitching operations.) Thereafter, the "hard" cloth passed effectively through the folders, thus eliminating the problem of raw edges resulting from the double stitching operations. However, plaintiff still experienced the same difficulties of cloth fracture, needle burning, thread breakage and malformed stitching in its operations.

Because of these problems, plaintiff was required to do extensive repair work on the jackets, and increased its repair department from two operators to as many as thirty or forty. The "hard" cloth also caused a decrease in the speed of production since plaintiff was required to slow down the operation of its machines to avoid needle burning and breakage.

Throughout the performance of the contracts, plaintiff repeatedly advised defendant's officials of its difficulties in making the jackets. Defendant's representatives acknowledged that they were aware of the problem concerning "hard" cloth and agreed to furnish "softer" ma-

terial in future shipments. Nevertheless, except for one shipment of "soft" sateen and one shipment of herringbone twill which defendant had substituted for the sateen (as to which no sewing difficulties were encountered), deliveries of the "hard" sateen continued throughout plaintiff's performance.

Plaintiff was substantially delayed in its deliveries of manufactured jackets because of these problems encountered in the manufacturing process. Consequently, defendant's contracting officer advised plaintiff that the contracts would have to be cancelled unless plaintiff entered into subcontracts with other manufacturers so as to expedite deliveries. Plaintiff did subcontract a total of 630,000 units to three other manufacturers, although one of these agreements was actually executed a short time prior to plaintiff's discussion with the contracting officer concerning delayed deliveries. Interestingly enough, the record indicates that the manufacturer to whom plaintiff shipped a supply of Government-furnished sateen cloth from its own stock experienced the same sewing difficulties as did plaintiff.

Plaintiff completed performance on both contracts in the early part of 1953. On April 21, 1953, plaintiff filed a claim with defendant's contracting officer for $83,362.88, representing increased costs allegedly caused by the "hard" Government-furnished sateen. The claim was denied, however, as was plaintiff's subsequent appeal to the Armed Services Board of Contract Appeals. The Board found (ASBCA No. 2382 (1955)), among other things, that there had been no satisfactory showing by plaintiff that the Government-furnished cloth was not satisfactory for use. Plaintiff thereupon brought this suit for a review of the administrative determination.

The trial commissioner has found, and plaintiff does not deny, that the sateen cloth furnished by defendant conformed to the applicable specifications relating to its manufacture. It is plaintiff's contention that, despite compliance with such specifications, the Government-furnished cloth was nevertheless not of a type "suitable for use" within the intendment of Article 29(a) of the contracts existing between the parties. Defendant, on the other hand, takes the position that the "suitable for use" clause means nothing more than that defendant undertook to furnish specification cloth from which specification jackets could be manufactured. Defendant therefore denies liability from this claim on the ground that specification cloth was furnished to plaintiff and plaintiff did, in fact, manufacture specification jackets from that fabric.

This case is evidently the first in which a court of law has been called upon to determine whether or not Government-furnished property manufactured in accord with applicable specifications, and which could be used to make the final end product contracted for, is, ipso facto, property "suitable for use" within the meaning of that clause of Article 29(a). The contracts here involved do not themselves purport to define the meaning of that term. Nevertheless, the Armed Services Board of Contract Appeals has, on occasion, interpreted such provisions, and we may properly consider these interpretations for guidance in resolving the issues raised in this case. Art Center School v. United States, 142 F.Supp. 916, 136 Ct. Cl. 218 (1956).

Thus, in Gillsam Mfg. Co., ASBCA No. 4461 (1958), a case involving a "suitable for use" provision identical to that in Article 29(a) herein, although not an express determination that the property in question did not conform to the applicable specifications, the Government-furnished fabric created delays in performance by reducing the output of the machines, thereby increasing the costs of production. The Board said:

> "Trimmed of all extra questions, the issue here is simply one of 'suitability' of the cloth for the use for which it was intended. Now it cannot be gainsaid that appellant did accomplish performance but, as we may well say, by the use of a

slow-sewing machine needle speed. The Government points to this completion of the contract as proof that appellant's claim lacks merit.

*"We cannot agree that the fact that the goal was accomplished is proof against appellant's claim. The claim is not that of a non-arrival at the goal. It is one of unnecessary roadblocks getting there.* * * * It seems reasonable to say, under the issues of this case, that 'suitability' for use is not measured by conformance with or non-conformance with specifications but goes deeper than that, and deals with the makeup of the individual fiber—was it brittle or not?—and this, whether or not the fiber acquired the alleged brittle condition in its manufacture or subsequent thereto. [Emphasis added.]

* * * * * *

" * * * There is apparently no contention that such [specification] cloth was not furnished; but, as stated above, the real question is that of its suitability. If, then, we find that it was not suitable for use in the customary way and its use caused appellant the losses claimed, the question then becomes one of considering whether or not the Government's insistence that appellant go ahead and use it, is not, in effect changing the above-quoted provision for reimbursement. In effect it would be to include reimbursement for extra expense incident to devising a method for using unsuitable material, provided that material is specification material. * * *"

Similarly, in Globe Crayon Co., AS BCA No. 1486 (1954), a case again involving an identical Government-furnished property clause as is here involved, the Government furnished an ingredient which admittedly met the applicable specifications for the manufacture of that ingredient. Nevertheless, the use of the ingredient in the item to be manufactured by Globe under the contract decreased the rate of production with a consequent increase in costs. Said the Board:

"Other findings appear in the report but it is sufficient for the purposes of this decision to say, that, though the Bureau found it possible to make the crayons with this ingredient, the results were such as to show a grave doubt of accomplishing the crayons in commercial quantities with any practical speed.

* * * * * *

" * * * Here the crayons can be made, and apparently are being made, or have been made by this time, but under circumstances indicative of a radical change in performance or, at least a greatly extended performance, not within the contemplation of the parties at the time they entered into the contract. We believe that, under such circumstances, it is reasonable to say that the ingredient was not suitable."

We find the Board's thinking in these cases to be persuasive. Defendant's interpretation of the "suitable for use" clause as meaning only that it undertook to furnish specification fabric from which the jackets contracted for could be manufactured is too narrow. The clause must be more than a mere concatenation of word symbols. Yet, the net effect of defendant's interpretation would be to render the phrase "suitable for use" in the second sentence of Article 29(a) totally devoid of meaning, for the first sentence of that Article makes clear that the property furnished by the Government was to be specification cloth which was to be used, and could be used, to fabricate the jackets contracted for. Rather than reach such a result, we will strive for an interpretation which gives a reasonable meaning to all provisions, thus giving effect to all parts of the instruments. Restatement, Contracts, § 236(a) (1932).

In our opinion, defendant has undertaken to do two things under

Article 29(a) in connection with the property it agreed to furnish plaintiff. Defendant promised to furnish cloth which met the specifications established for that cloth *and* promised to furnish cloth which is "of a type suitable for use." Suitability, taken in context, does not mean merely that the end product can be manufactured from the cloth, but rather refers to the cloth as it is cut and sewn upon *in the process of manufacturing* the end product. The cloth itself must be suitable from a mass production manufacturing standpoint, taking into consideration the background of price and delivery schedules.

The fallacy in defendant's interpretation of "suitable for use" may be illustrated by carrying it to its logical conclusion. Thus, in this case plaintiff agreed to manufacture 1,000,000 jackets from specification cloth to be furnished by defendant. There is no doubt that the cloth so furnished met the technical wording of the specifications and that it could be, and was, used to fabricate specification jackets. However, if the condition of the cloth was nevertheless such that the jackets could not be made on a mass production basis at all, but had to be hand-sewn individually, plaintiff would not be entitled to increased costs of production under the theory defendant urges upon us. This is so because the cloth would obviously be specification cloth from which specification jackets could be manufactured, albeit at an unreasonable expenditure of time and money. It can hardly be said that the parties contemplated such a result would follow from the "suitable for use" clause at the time they entered into the contracts. Of course, the facts in the case at bar are not as drastic as those we have hypothesized, but the principle involved is the same. It would seem that it was just this type of hazard that the parties sought to guard against by the use of the term "suitable for use" in Article 29(a). Therefore, it is our conclusion that suitability under Article 29(a) has reference to the appropriateness of the Government-furnished property for use *in the process of manufacturing* the items contracted for. It would follow from this that cloth conforming to the applicable specifications and which could be used to make specification jackets is not necessarily "suitable for use" within the meaning of Article 29(a).

Whether or not any given property is actually "suitable for use" as we have defined that term is a question of fact to be determined on the basis of the unique circumstances of each case. As we have indicated, the Armed Services Board of Contract Appeals has found in this case that there was no satisfactory showing that the Government-furnished sateen was not suitable for use. Under the "Disputes" clauses of these contracts and the so-called Wunderlich Act, 68 Stat. 81 (1954), 41 U.S.C.A. §§ 321, 322, the Board's decision is "final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." Facts must be proven by plaintiff which show that, under the language quoted above, the Board's decision cannot stand.

Upon consideration of the record in this case, we have concluded that plaintiff has discharged this burden. Suitability of cloth for the purpose of manufacturing garments on a mass production basis is not necessarily established by the tests incorporated in defendant's specifications for these tests do not purport to control all factors which may have a definite bearing on this matter.[1] It is apparent from the record that plaintiff encountered substantial difficulties in performing under these contracts, despite the fact that plaintiff used the sateen furnished by the Government and followed defendant's specifications controlling the ac-

1. See findings 22 and 23.

tual process of manufacturing to the letter. In addition, there are other facts which we feel are particularly significant. For example, prior to the award of the contracts, defendant's representatives conducted an inspection to determine the adequacy of plaintiff's plants, equipment and personnel. When the difficulties in issue arose, plaintiff took what remedial measures it could, but with only limited success. Defendant was aware of these difficulties from the outset and its representatives were at plaintiff's plants constantly, yet they could do little more than promise shipments of "softer" cloth in the future; evidently they could suggest no other appropriate remedies. There is no indication that plaintiff was lax in performing any phase of the manufacturing process or could have avoided the increased costs within the limitations of defendant's specifications. Nor is there any indication that the "hardness" or stiffness of the cloth was not the cause of plaintiff's increased costs.

In view of these considerations, we must conclude that the overwhelming weight of the evidence establishes that the Government-furnished sateen was not reasonably suitable for use on a mass production basis within the meaning of Article 29(a). Plaintiff is thus entitled to an equitable adjustment in the contract price in order to recover its increased costs under these contracts, in an amount the parties agree to be $66,-846.63. Insofar as plaintiff seeks to recover its loss of profit, however, such relief must be denied under the express provisions of Article 29(a).

 At the trial of this case on February 10, 1959, defendant was permitted, without objection on the part of plaintiff, to amend its answer by stating an offset and counterclaim. It was alleged that plaintiff had realized certain savings in performing the contracts by virtue of a deviation from specifications allowed by the contracting officer on May 13, 1952. Although this claim was thus made nearly 7 years after the jackets involved had been fabricated, de-

fendant has nonetheless proven that plaintiff did actually realize savings in the amount of $674.70, and we are therefore constrained to hold that defendant is entitled to recover on its counterclaim.

Plaintiff is entitled to recover in the amount of $66,846.63, less defendant's offset and counterclaim in the amount of $674.70, for a net recovery to plaintiff in the amount of $66,171.93. Judgment will be entered for plaintiff in that amount.

It is so ordered.

DARR, Senior District Judge, sitting by designation, and DURFEE, LARAMORE and WHITAKER, Judges, concur.