**THOMPSON RAMO WOOLDRIDGE INC.**

v.

**The UNITED STATES.**

**No. 104–64.**

United States Court of Claims.

May 13, 1966.

Gilbert A. Cuneo, Washington, D. C., attorney of record, for plaintiff. David V. Anthony, Thomas H. Truitt and Sellers, Conner & Cuneo, Washington, D. C., of counsel.

Edgar H. Twine, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, JONES, Senior Judge, and LARAMORE, DAVIS and COLLINS, Judges.

DAVIS, Judge.

Plaintiff seeks an equitable price adjustment under a supply contract with the Department of the Navy, and, alternatively, damages for breach of that contract. The claim is that the defendant breached a contractual warranty requiring it either to furnish microfilm suitable for use in performing or to grant a

price increase if suitable microfilm were not supplied.

On May 10, 1957, the Bureau of Ships issued an Invitation for Bids for the production of thirty-six radio transmitters.[1] The bid schedule recited that the defendant would supply the successful bidder with three items of Government-furnished property. These were a prototype radio transmitter, copies of a Navy Technical Manual which described the transmitter, and "one set of Microfilm of Manufacturing Drawings". None of these three items described a transmitter identical to the one to be supplied under the contract. A second provision of the schedule ("Production Equipment") set out several manufacturing standards which the contractor had to meet:—the equipment to be assembled was to conform with certain Bureau of Ships specifications; it was to duplicate, with minor exceptions, the Government-furnished prototype transmitter, as described in the Navy Technical Manual; and it was to be physically, mechanically and electrically interchangeable with corresponding parts and components of the Government-furnished sample transmitter.

Under the Bid Invitation as originally issued, only one item of Government-furnished property—the Navy Technical Manual—was to be made available at the pre-award stage for inspection and consideration by interested contractors. Officers of the plaintiff-corporation [2] studied this Invitation, but decided (for reasons which are now the subject of sharp dispute) that it would not bid. On May 28, 1957, the Government amended the Invitation for Bids to make the Government-furnished "Microfilm of Manufacturing Drawings" also available during the pre-award period. This apparently revived plaintiff's interest in bidding, and it dispatched an officer to examine a set of the microfilmed drawings. After viewing the microfilm during the allotted three-hour period, this representative reported that "the index [of the film] appeared to be complete, well-organized, and that the microfilm, as best he could tell from the use of the viewer appeared to be fair." [3] Reversing its earlier decision, Thompson Ramo then submitted a bid, and was awarded the contract on June 28, 1957.

As the successful bidder, the plaintiff requested and received the three items of Government-furnished property. It sent the microfilm out to have prints of the manufacturing drawings made which could be utilized in producing the radio transmitters. A large number of the prints turned out to be of poor quality and could not be used. As a result, the plaintiff asked the Government's assistance in obtaining better microfilm, but the defendant was able to replace only a small portion of the defective film. The plaintiff then spent many engineering and technical man-hours retracing drawings which were not adequately reproduced or reproducible, and obtaining missing information by checking the microfilm through a viewer and recording information thus secured on the drawings. In some cases, the Government-furnished sample transmitter was disassembled in order to determine missing measurements, while in others needed details were obtained from the sample by "reverse engineering". By letter of June 28, 1960, Thompson Ramo advised the Government of these difficulties, asserting that the microfilm was "not suit-

1. This was model "AN/FRT-18 Radio Transmitter."

2. The contract was initially awarded to Production Research Corporation. Defendant later recognized Radio Condenser Company as the successor in interest to Production Research. After the contract was completed, plaintiff purchased the assets of Radio Condenser, including this contract claim. "Plaintiff" or "Thompson Ramo" is used to designate whatever legal entity was the owner of the contract at the pertinent time.

3. This quotation is from the opinion of the Armed Services Board of Contract Appeals. The observations of plaintiff's officer were summarized at the Board trial as follows: "He said the indexes appeared to be complete and clean and the prints, as he saw them, by use of the viewer, appeared to be fair." Tr. 67.

able for the use contemplated by the contract" and that it "had to expend a substantial amount of time and money to make the specifications and drawings workable."[4] On these grounds, it sought an upward equitable adjustment in the contract price of $265,328.36. The contracting officer denied this claim, and plaintiff appealed to the Armed Services Board of Contract Appeals.

As framed by the parties, the dispute before the Board (as in this court) focused on the meaning and relationship of three contract provisions.[5] The first, Additional General Provision number 30 (the "AGP" clause) explicitly warranted that the microfilm was fit for its "in-tended use". It stated in part that "the Government shall deliver to the Contractor * * * the property described in the Schedule or specifications * * *. * * * In the event the Government-furnished Property is received by the Contractor *in a condition not suitable for the intended use* the Contractor * * [shall take certain prescribed steps]. [Then] * * *, the Contracting Officer upon written request of the Contractor *shall equitably adjust* the delivery or performance dates or *the contract price*, or both, and any other contractual provision affected by the rejection or disposition * * * [of the unsuitable property]." [Emphasis added.][6] However, a second

---

4. The relevant portion of the plaintiff's letter reads as follows: "The contractor could not obtain the missing needed information from take-offs of the Government-furnished sample. It discovered that the sample was of a different model of the unit than the contract item. The technical manuals which had been furnished by the Government did not include all of the latest approved revisions, due to an oversight on the part of the Government. As a result, the contractor had to expend a substantial amount of time and money to make the specifications and drawings workable. Most of the drawings submitted by means of the microfilm were not readable nor usable. They were not suitable for the use contemplated by the contract. The contractor had to devote effort over and above that originally contemplated by the contract to make them suitable for the intended use. Furthermore, a substantial number of drawings were missing. Without them, the contract could not have been performed. The contractor produced the missing drawings.

"The above condition of the microfilm also directly caused the contractor additional expense and loss of time in connection with purchasing parts, components, and supplies and in its production under the contract."

5. The contract contained the General Provisions of Standard Form 32 (1949 Ed.), the Standard Article 12 Disputes Clause, Article 30 (Government-Furnished Property clause) (infra, fn. 6), and Article 39 (Order of Precedence, infra). The Schedule also contained its own Government-Furnished Property clause (the "Schedule" clause), infra, fn. 7.

6. This standard Government-Furnished Property article, as incorporated in this contract, was as follows in full text:

"30. GOVERNMENT-FURNISHED PROPERTY

"(a) The Government shall deliver to the Contractor, for use in connection with and under the terms of this contract, the property described in the Schedule or specifications, together with such related data and information as the Contractor may request and as may reasonably be required for the intended use of such property (hereinafter referred to as 'Government-furnished Property'). The delivery or performance dates for the supplies or services to be furnished by the Contractor under this contract are based upon the expectation that Government-furnished Property suitable for use will be delivered to the Contractor at the times stated in the Schedule or, if not so stated, in sufficient time to enable the Contractor to meet such delivery or performance dates. In the event that Government-furnished Property is not delivered to the Contractor by such time or times, the Contracting Officer shall, upon timely written request made by the Contractor, make a determination of the delay occasioned the Contractor thereby, and shall equitably adjust the delivery or performance dates or the contract price, or both, and any other contractual provision affected by such delay, in accordance with the procedures provided for in the clause of this contract entitled 'Changes.' In the event the Government-furnished Property is received by the Contractor in a condition not suitable for the intended use the Contractor shall, upon receipt thereof, notify the Contracting

article—the "Schedule" clause—after naming the three specific items of property to be furnished by the Government, could possibly be read, on its face, either to limit or disclaim altogether the Government's warranty obligation under the AGP clause.[7] A third provision ("Order of Precedence") seemed to provide for the resolution of conflicts by stating that "to the extent of any inconsistency between the Schedule [and] * * * the General Provisions, the Schedule shall control."

The Government denied that the microfilm was unsuitable. But it further argued that even if the property were unsuitable the exculpatory language of the Schedule clause barred recovery through the operation of the Order of Precedence provision. Considering the various sections, the ASBCA found "no real inconsistency" between the AGP clause and the disclaimer language of the Schedule article. It concluded therefore that the Order of Precedence provision was inapplicable. The function of the AGP clause, said the Board, was to spell out a remedy—equitable adjustment—for instances where the Government delivered unsuitable property, without listing the specific property to be furnished or stating its intended use. Conversely, the Schedule clause provided no express remedy, but instead described the particular items the Government was bound

---

Officer of such fact and, as directed by the Contracting Officer, either (i) return such property at the Government's expense or otherwise dispose of the property, or (ii) effect repairs or modifications. Upon the completion of (i) or (ii) above, the Contracting Officer upon written request of the Contractor shall equitably adjust the delivery or performance dates or the contract price, or both, and any other contractual provision affected by the rejection or disposition, or the repair or modification, in accordance with the procedures provided for in the clause of this contract entitled 'Changes.' The foregoing provisions for adjustment are exclusive and the Government shall not be liable to suit for breach of contract by reason of any delay in delivery of Government-furnished Property or delivery of such property in a condition not suitable for its intended use."

7. This clause read as follows:
"GOVERNMENT FURNISHED PROPERTY: Upon the Contractor's written request to the Chief, Bureau of Ships, via the cognizant Naval Inspector, the Government will furnish the following:
"1. One (1) Model AN/FRT–18 Radio Transmitter (to be requested from the Bureau of Ships, Code 881C).
"2. Two (2) copies of Technical Manual NAVSHIPS 92018 (with existing revisions, if any) and two (2) copies thereof per each equipment. These manuals shall be requested from the Bureau of Ships, Code 993, promptly after the contract is awarded, allowing at least sixty (60) days for delivery.
"3. One (1) set of Microfilm of Manufacturing Drawings (to be requested from the Bureau of Ships, Code 993).

"These Government-Furnished items were accepted by the Government pursuant to the contract(s) under which they were procured by and delivered to the Government, but the Specifications and other requirements of said contract(s) are not identical to the requirements of this contract. These Government-furnished items are furnished for such information and assistance as they may provide the Contractor with respect to the general nature of equipments and maintenance parts to be delivered under this contract, and for use of the Contractor in meeting the requirements of this contract with respect to interchangeability as set forth under the heading 'PRODUCTION EQUIPMENT' above. In addition the copies of Technical Manual NAVSHIPS 92018 are furnished for use of the Contractor in meeting the requirements of this contract with respect to Technical Manuals, Revisions and Negatives. The Government does not represent that the Government-furnished AN/FRT–18 Radio Transmitter meets the requirements of this contract in every respect, nor does it represent that the microfilm is legible in whole or in any particular part or that the drawings from which the microfilm was made, are complete and accurate in all respects or in any particular respect, and it does not represent that equipments or maintenance parts made in accordance with the Government-Furnished AN/FRT–18 Radio Transmitter and/or Technical Manual NAVSHIPS 92018 and/or Microfilm of Manufacturing Drawings will meet the performance or other requirements of this contract including the specifications referenced directly or indirectly herein."

to supply and stated the purpose for which it was furnished.[8] The Board ruled that the Schedule clause did not constitute either a complete or partial disclaimer beyond the reach of the AGP provision, saying: "We believe the two clauses compliment each other. Construing them together we believe they provide for an equitable adjustment in the contract price when the property is not suitable for its intended use." The Board then held that the property was fit for its intended use, since it was "usable and useful" in performing some aspects of the contract, even though it was not suitable for making prints. The production of prints was held not to be an intended use of the microfilm. Plaintiff's claim for an equitable adjustment was therefore denied. 1963 BCA ¶ 3931.

The contractor now challenges the Board's decision under the Wunderlich Act, 41 U.S.C. §§ 321, 322. Only the administrative record is before us. On that record we discuss the three issues which, in our view, control resolution of the dispute. These are whether the disclaimer language in the Schedule clause wiped out, or seriously diminished, the AGP warranty of suitability; whether the making of prints was an "intended use" for which the Government furnished the microfilm; and whether, if so, the microfilm was in fact suitable for that purpose.

I

It cannot seriously be questioned that the AGP provision (supra, fn. 6), standing alone, would give the plaintiff a monetary remedy for the Government's failure to furnish suitable microfilm. That is precisely what the clause says and was meant to say. Topkis Bros. Co. v. United States, 297 F.2d 536, 155 Ct.Cl. 648 (1961). The defendant's main position, however, is that the AGP representations as to suitability were negated by the contract's Schedule clause, especially the part which stated (supra, fn. 7):

> The Government does not * * * represent that the microfilm is legible *in whole or in any particular part* or that the drawings from which the microfilm was made, are complete and accurate *in all respects or in any particular respect*, * * *. [Emphasis added.]

The Government's argument, plain and simple, is that this provision freed it from all responsibility for the microfilm's condition. It maintains that the quoted language told Thompson Ramo not only that the Bureau of Ships did not warrant the microfilm in its entirety (i. e., 100%), but also that it did not warrant any of the film (not even .01%). We disagree and hold that the Government remained responsible, within limits, for microfilm that was not suitable.

The key to the textual problem is the established canon that contract provisions should not be construed as conflicting unless no other reasonable interpretation is possible. Hol-Gar Mfg. Co. v. United States, 351 F.2d 972, 979, 169 Ct.Cl. 384, 395–396 (1965); 3 Corbin, Contracts § 549 (1960). This is particularly so when the provision sought to be eliminated, or subordinated, is a standard mandatory clause of broad application, like the AGP Government-furnished Property article. Cf. Kaiser Industries Corp. v. United States, 340 F.2d 322, 329–330, 169 Ct.Cl. 310, 323–324 (1965); Fehlhaber Corp. v. United States, 151 F.Supp. 817, 825, 138 Ct.Cl. 571, 584 (1957), cert. denied, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108; Loftis v. United States, 76 F.Supp. 816, 825–826, 110 Ct.Cl. 551, 627–629 (1948); Farnsworth & Chambers Co. v. United States, 346 F.2d 577, 580–581, 171 Ct.Cl. —— (June 1965); Jack Stone Co. v. United States, 344 F.2d 370, 374–375, 170 Ct.Cl. 281, 288 (1965). Such a standard article, incorporated in the agreement,

---

8. The Schedule clause was tailored to deal with the specific transaction before the parties; the AGP clause was, in the words of the ASBCA, "so-called 'boiler plate'", i. e., a Standard Form provision. See, fns. 5–7, supra.

cannot lightly be read out of it, or deprived of most of its normal substance.

■ With this pervading rule in mind, we think that there is a reasonable way to harmonize the standard AGP article on Government-furnished property with the less standard Schedule clause on the same subject. The latter need not be interpreted as broadly as the defendant would have it. That reading passes over the significance of the word "particular" (twice employed in the Schedule clause) which, in our view, should be held to narrow the reach of the disclaimer in the specialized provision. That clause does not employ the phrase "in whole or in part" which covers, usually, the entire spectrum. "In whole or in any *particular* part" (emphasis added) is different. "Particular" signifies a separate or specific, single portion or part of a class or thing. Courts ordinarily give effect to every word or phrase of a contract. See, e. g., Bethlehem Steel Co. v. United States, 75 Ct.Cl. 845, 868 (1932). Since the limiting term "particular" was included, the Schedule clause's exculpatory language may be read as indicating only that the Government was not warranting 100% perfection (i. e., "in whole"), or any individual frame of film comprising a subpart of the whole, or a specific group of frames concerning a particular aspect of the transmitter (i. e., "any particular part" or "particular respect").[9] Plaintiff asserts that it read the contract in this manner.

■■ This meaning is not unmistakably conveyed by the Schedule provision. It is, however, a construction permitted by the literal words, and it has the great merit of allowing the AGP article to retain some substantial meaning. Furthermore, it is settled that "if some substantive provision of a government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance", this court will adopt that interpretation where "there is something for each party", "no ready answer can be drawn from the texts alone", "both plaintiff's and defendant's interpretations lie within the zone of reasonableness", and neither interpretation "appears to rest on an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap." WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876, 163 Ct.Cl. 1, 6 (1963). In this case there is, of course, something to be said for both asserted interpretations. The Government's simple and facile construction invites adoption because it is uncomplicated and because the language normally used to express a complete disclaimer—"in whole or in part"—closely resembles that here in dispute. On the other hand, the contractor's view is attractive since it is cautious and precise, gives meaning to each word, is not far-fetched, and, at the same time, gives effect to the standard AGP article. Both interpretations can be called reasonable. The Government is not required to warrant property it furnishes.[10] But a contractor could justifiably judge—especially with the standard AGP clause before him—that the phrases "any particular part" and "any particular respect" were inserted to preclude one who had received otherwise acceptable microfilm from singling out a specific, crucial part or aspect of the film as being defective (though not amounting to a substantial

9. At the Board trial, Government counsel asked the head of the Transmitter Equipment Group of the Bureau of Ships (who supervised preparation of the basic specifications for plaintiff's contract) to state the "reasons for this type of a clause, limiting clause." He answered: "The reasons, as I have seen them, are that microfilm, to deliver 100 percent perfect microfilm, for the use of anyone else, is an impractical situation." Tr. p. 198.

10. Defendant may not have subjectively intended to warrant this property, but that fact alone is not enough to save it from liability. Cf. Thomson v. United States, Ct.Cl., 357 F.2d 683, decided March 18, 1966.

defect in the whole) and seeking an equitable adjustment for costs stemming therefrom.[11]

On this view, the record reveals no "obvious omission, inconsistency, or discrepancy of significance" which would adequately warn the plaintiff that "he must consult the Government's representatives if he intends to bridge the crevasse in his own favor." Beacon Constr. Co. v. United States, 314 F.2d 501, 504, 161 Ct.Cl. 1, 7 (1963). In judging whether the contractor was justified in proceeding as it did, it is crucial that the AGP clause explicitly warranted the suitability of Government-furnished property. There was no reason for the plaintiff to believe the Government would include this standard article only to have it read entirely out (or diminished to a wraith) by another article.[12] It was plain to all that the microfilm's condition would be an important factor affecting the costs of meeting the contract's interchangeability requirements (see Part II, infra). The Schedule clause, carefully read, did not go counter to the main purpose of the standard AGP provision. In any number of express ways, the Government could have made it clear that the AGP provision was not supposed to cover microfilm. But it did not do so. In leaving both contract articles standing without a cross-reference explaining the relationship between them, the Government's draftsmen left room for the contractor to draw the reasonable inference that the two provisions were consistent and that both were to remain effective.

■■ "The Government, as the author, has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions—as well as the main risk of a failure to carry that

responsibility." WPC Enterprises, Inc. v. United States, supra, 323 F.2d at 877, 163 Ct.Cl. at 6. The defendant must therefore bear the onus of failing to convey exactly the intended scope and interconnection of the two clauses, or, more precisely, the risk of failing clearly to express its meaning in the disclaimer language in the Schedule article. That clause did define (and therefore limit the reach of) the AGP provision, but this limitation was far less than defendant urges. The plaintiff could not expect to receive 100% accurate or complete microfilm, and the defendant was under no duty to furnish property in such condition. Nor could the plaintiff obtain a recovery because some particular drawing (perhaps a crucial one) was defective. But since the general AGP warranty was not wiped out, the plaintiff had the right to expect microfilm which was substantially complete, accurate, and legible in most respects, and which would enable it reasonably to produce radio transmitters in accordance with the contract's terms.

■ Nothing outside the four corners of the contract changes this conclusion. The Government points to the plaintiff's pre-bid conduct, insisting that it shows that at bid-time Thompson Ramo interpreted the Schedule clause as relieving the Government of all responsibility for defective microfilm. As we have noted, the plaintiff decided to submit a bid only after it had had the opportunity to inspect the microfilm for itself. But the record does not show that it sought this opportunity because it read the Schedule clause as a total disclaimer, prohibiting (in effect) reliance on the AGP article. Defendant's suggestion to that effect is no more than a hunch. The evidence is quite consistent with the conclusion that

11. It might be argued that given numbers of imperfect "particular" portions of microfilm would cover the whole range of defects from .01% to 100%, and that the Government thus disclaimed all liability for unsuitable property. One flaw in this contention is that the disclaimer language refers only to "any particular part" and "particular respect", not "parts" and "re-

spects"; this wording seems to preclude disclaimer of an accumulation of defective specific portions.

12. The defendant has not seriously urged that the word "particular" was inadvertently included, or that the parties never intended to attach significance to it.

plaintiff, even though it considered the microfilm as generally warranted, may still have desired to examine it firsthand. Any one of a number of practical considerations may have prompted the plaintiff to want to do this. It may have had doubts as to the full compass of the warranty of "suitability"; it simply may not have wanted to rely solely on the warranty, for, if the microfilm proved unsuitable, such complete reliance might entail preventable production difficulties, followed by attempts at settlement, lengthy and costly negotiations, full-scale litigation, or the possibility of not recovering all the increased costs attributable to the defective films. By examining the microfilm for itself, plaintiff could increase the probability that it would not end up in such straits. This is a reasonable explanation of plaintiff's conduct which neither the record nor the Board's opinion negates in any way.

For similar reasons, it does not prove that Thompson Ramo understood the microfilm warranty to be disclaimed (by the Schedule clause) that the contractor was given a chance to see for itself the condition of the film; that it decided to bid on the basis of its representative's judgment that the film was adequate; or even that plaintiff originally felt that the film contained the information necessary to solve the manufacturing problem presented by the contract.[13] The defendant must, in addition, demonstrate that the contractor wanted an opportunity to inspect *because* it read the Schedule clause as relieving the Government of responsibility for the microfilm's suitability. This causal relation is critical since it is this latter fact which the defendant seeks, on this point, to have us infer from the plaintiff's conduct. The evidence does not significantly bear upon this factor. At best, some of it shows that plaintiff relied to a degree on its own appraisal. But it does not follow from this that plaintiff believed it could not, if necessary, also invoke the warranty. The evidence of pre-bid conduct does little to help determine why the plaintiff refused to bid until after it was given the opportunity to inspect.

Lastly, we hold that Thompson Ramo's pre-bid examination of the microfilm did not render the contract warranty inoperative (through waiver or estoppel) or prevent the plaintiff from invoking it as a basis of recovery. It has not been proven, in the first place, that this examination provided actual knowledge of the microfilm's inferior capacity for making prints. The contrary seems more probable, for, after the contract was executed, the plaintiff promptly shipped the microfilm out to have prints made, apparently on the assumption that it was in condition good enough to produce usable prints. A fair inference is that the inspection revealed nothing to warn plaintiff that the defendant's representations might be erroneous as to print-making. Secondly, the contract did not require the plaintiff to inspect. It could have relied exclusively on the warranty without taking any additional steps, but it undertook on its own to view the film. This extra caution should not deprive it of the right to rely on the warranty which it would ordinarily enjoy, unless there is a clear affirmative showing that the inspection revealed actual knowledge of the critical facts. That proof, as we have said, is lacking. Moreover, discovery of the actual condition of all of the film was a difficult chore. One reason the Government sought to disclaim liability for every frame of the microfilm was because the responsible Navy bureau did not have the personnel necessary for a thorough—and time-consuming—inspection of the film's condition, frame by frame. While the Navy might in ordinary course check the over-all quality of the microfilm, it apparently did not feel that it could examine the condition of the individual drawings. The bidders, including this contractor, were in the

13. There is some testimony to support the defendant's contention to this effect.

same predicament.[14] In comparable circumstances of difficulty in inspection, we have held that the mere fact of inspection of Government-furnished property does not defeat a warranty of the property's fitness. Ekco Products Co. v. United States, 312 F.2d 768, 772, 160 Ct.Cl. 75, 81–82 (1963).

Our conclusion that the Government remains bound by its agreement to supply suitable microfilm accords with the principles we have followed in cases of erroneous statements of fact by the Government in the contract papers. In such situations the general rule is that the contractor may rely on definitive contract representations. See, e. g., Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914).[15] The AGP article, taken together with the Schedule clause, was essentially a representation of the existence of a fact, i. e., that, on the whole, the microfilm was fit for its intended purpose. Cf. Dale Constr. Co. v. United States, 168 Ct.Cl. 692, 699 (1964). In the absence of a specific direction to the contractor to view other documents for qualification, expansion or explanation of the scope of this warranty (see Flippin Materials Co. v. United States, 312 F.2d 408, 413–414, 160 Ct.Cl. 357, 365–367 (1963)) or to inspect and determine for itself the property's condition, the warranty may properly be invoked. It is fitting to repeat what the Supreme Court said in Hollerbach half a century ago: "If the government wished to leave the matter open to the independent investigation of the claimants, it might easily have omitted the specification * * *" which warranted the condition of the property. 233 U.S. at 172, 34 S.Ct. at 556.

II

The next task is to inquire whether the making of prints was, as the plaintiff claims, an "intended use" for which the Government furnished the microfilm. We indicated at the outset that the contract required Thompson Ramo to manufacture the radio transmitters so that the "components and parts of the equipment and maintenance parts shall be physically, mechanically and electrically interchangeable" with the prototype radio transmitter. The contract listed (in the Schedule clause) two general purposes the microfilm was to serve: "These Government-furnished items are furnished [1] for such information and assistance as they may provide the Contractor with respect to the general nature of equipments and maintenance parts * * *, and [2] for use of the Contractor in meeting the requirements of this contract with respect to interchangeability * * *." The ASBCA specifically considered this latter provision and interpreted it as demanding only that the microfilm be of some assistance in meeting the interchangeability requirement. As we have noted, the Board held "that the microfilm was usable and useful in obtaining interchangeability even though part of it was not suitable for making prints." "Nowhere in the clause", it said, "is the making of prints mentioned

14. Plaintiff's employee who looked at the film reported that the microfilm, "as best he could tell from the use of the viewer", "appeared to be fair."

15. In Hollerbach, this court construed one contract paragraph (# 33) as a "warranty", but held that other paragraphs "required the claimants to inform themselves of the condition" of the warranted property at the jobsite, and that when all the paragraphs were read together the "representations of the last-named paragraph [# 33] could not be regarded as a warranty upon which the claimants had the right to rely * * *." 233 U.S. at 169, 34 S.Ct. at 554. The Supreme Court reversed, holding that the general contractual language requiring the bidder to investigate the jobsite or satisfy himself of conditions did not relieve the Government from liability for positive, mistaken representations. Id. at 172, 34 S.Ct. 553. See Flippin Materials Co. v. United States, 312 F.2d 408, 413, 160 Ct.Cl. 357, 365 (1963), and cases cited therein at n. 8. Compare DuBois Constr. Corp. v. United States, 98 F.Supp. 590, 594, 120 Ct.Cl. 139, 168–169 (1951); Ross Eng'r Co. v. United States, 103 Ct.Cl. 185, 196–198 (1945), cert. denied 326 U.S. 735, 66 S.Ct. 45, 90 L.Ed. 438.

as an intended use and we do not think that it can be inferred."

Since this is an issue of interpretation (involving the meaning of the furnished-property clauses in this particular contract) which may be decided on the basis of the undisputed facts in the record before the Board, the court can independently resolve it under the Wunderlich Act. See River Constr. Corp. v. United States, 159 Ct.Cl. 254, 262 (1962); Kings Electronics Co. v. United States, 341 F.2d 632, 640–641, 169 Ct. Cl. 433, 446–447 (1965). Two important considerations point to the correct answer. One is the wording of the contract provision relating to the microfilm's utility (quoted immediately above); the other is the thought that, since the contract called for the *production* of radio transmitters, "suitable" Government-furnished property should be usable in a manufacturing setting.

There is a clear difference between the two uses prescribed for the microfilm. The first use—"for such information and assistance as * * * [it] may provide"—is provisional and indefinite, and seems to impose no more obligation on the Government than to furnish microfilm, without much regard to whether it is or is not a meaningful aid in performance. The second contemplated use—"in meeting the requirements of this contract with respect to interchangeability"—establishes a higher standard and imposes a real obligation on the defendant. This purpose is defined unequivocally, not tentatively, and specifically, not generally. This definite specificity is telling. A judgment as to whether or not property is "suitable for use" will, in largest part, turn on the circumstances in which it is to be used.

The course to be followed was charted in Topkis Bros. Co. v. United States, supra, 297 F.2d 536, 155 Ct.Cl. 648 (1961). There, the nub of our analysis was that "[s]uitability, taken in context, does not mean merely that the end product can be manufactured * * *"

by using the Government-furnished property, but rather that the property can readily be used *"in the process of manufacturing* the end product. [The Government-furnished property] * * * itself must be suitable from a * * * manufacturing standpoint, taking into consideration the background of price and delivery schedules." 297 F.2d at 541, 155 Ct.Cl. at 657 (emphasis in original). And on rehearing the court said that "suitability is an additional obligation assumed by defendant, a primary obligation, *and is determined by reference to the contract as a whole * * *."* 299 F.2d at 953, 155 Ct.Cl. at 681 (1962) (emphasis added). Applying these standards, we must conclude that the microfilm furnished to the plaintiff was not "suitable for * * * [its] intended use" unless it could serve as an adequate aid to the contractor in meeting the contract's interchangeability requirement. In this contract, interchangeability was an important element, and plaintiff had every right to expect that the film would help it in that aspect of production.

The Government does not deny this conclusion but it does deny that the film was to be of such help through the making of prints; in defendant's view, it would be enough if the bare film could somehow be utilized, even though adequate prints could not be made. The record shows conclusively, however, that plaintiff incurred great expense because it was unable to make prints out of the microfilm.[16] With the property furnished by the Government, the plaintiff's task of satisfying the interchangeability requirement was expensive and time-consuming. The workmen had to use a viewer and magnifier on the production line in order to obtain needed measurements and retrace drawings. They also had to disassemble parts of the prototype transmitter to determine dimensions. This enabled plaintiff to produce transmitters conforming with specifications. However, since drawings made by working backward in this

---

16. As shown in Part III, infra, it is plain that adequate prints could not be made.

way might not exactly agree with drawings used on previous contracts for the same equipment, there was no way to insure that parts made to the same scale as the prototype would be interchangeable with other similar transmitters. Prints would obviously have been much more efficient in the actual course of manufacture. In part, it was virtually impossible to comply with the interchangeability demand at all. A contract amendment eliminated the requirement with respect to certain parts. This, we think, is evidence that the Government's representatives agreed that without something more than the bare microfilm the Government-furnished property was not adequate to enable the contractor to meet the interchangeability standard (with respect to parts affected by the amendment).[17] Furthermore, the Board record indicates that plaintiff earnestly and without neglect attempted to meet the interchangeability norm. Plaintiff's difficulties were ultimately attributable, not to its fault, but to the failure of the microfilm to furnish the guidance needed for the production of interchangeable parts and components, and this failure resulted, in largest part, from the film's inadequacy as a base for prints. After discussing other means of promoting interchangeability, the Board expressly found that "the microfilm would have been *required* for an undisclosed but *substantial portion* of the parts and would of course

provide the *most economical means* of insuring interchangeability" (emphasis added). At best, only a small portion of the film was usable for making prints from which interchangeable parts could easily be manufactured.[18]

On these facts, the Board decided that *some* use of the film for making *some* prints utilizable for interchangeability—together with the fact that the prints could be used in other ways—was enough to meet the warranty. The Board believed that it was sufficient for the Government to furnish material which was "usable and useful [in some way] in obtaining interchangeability."

■ As we read the contract, it called for more than that minimum. The plaintiff was required to satisfy the standard of interchangeability with a reasonable business effort in a manufacturing context. As in *Topkis Bros Co.*, supra, the contract was for manufacturing, not for research and development. The film was designated as "Microfilm of *Manufacturing* Drawings" (emphasis added). For manufacturing, the real utility of the film lay in the fact that it might be employed for making prints which could be used in the workshop, passed around on the production line, or used in purchasing supplies.[19] *Topkis* tells us that Government-furnished property is not suitable for its intended use simply because "by hook or by

---

17. The contract was amended on May 19, 1959 (some two years after it was awarded). This was done because it was found impracticable to dismantle all parts of the Government-furnished prototype radio transmitter in order to ascertain whether parts were interchangeable. The amendment eliminated the interchangeability requirement as to those parts and components of the prototype transmitter which were not readily accessible and could not be easily removed. The microfilm prints could have been used in ascertaining the interchangeability of these parts. Apparently, one of the factors in the defendant's decision to agree to this amendment was its realization that the plaintiff could not meet the requirements as to these

parts without prints. As to other parts, the lack of prints remained an obstacle to efficient performance.

18. In its opinion the Board found: "Although there was some conflict in the evidence we believe that it clearly supports appellant's [plaintiff's] contention that it was not suitable for making prints." See Part III, infra.

19. If it appeared that the contractor had been told not to count on employing the film to make prints, or that, if some prints happened to be legibly produced, the contractor had no right to expect them to be useful in manufacturing, the posture of this case would, of course, be different.

III

crook" the contractor can otherwise comply with the specifications—at the cost of unreasonable delay or expenditures. 297 F.2d at 541, 155 Ct.Cl. at 657. When the Government agreed to furnish microfilm, it agreed to give the contractor means which would enable it to meet the interchangeability requirement, in the ordinary course of manufacture, without excessive or exorbitant expenditures.[20] Were we to accept the Board's view we would hold, in effect, that the plaintiff assented to undertake the work and to meet the interchangeability requirement without having available the means to do so. This makes little sense in the business world.

Had the Government intended the microfilm only to be "usable and useful [in some way] in obtaining interchangeability", as the Board ruled, it should have stated only the first of the two uses prescribed for the microfilm, i. e., that the film was furnished "for such information and assistance as * * * [it] may provide." The provisional nature of this obligation probably would have saved the Government even for furnishing microfilm of dubious utility (as it did supply). But the Government went further and represented that the microfilm would be suitable for use in producing interchangeable parts and components. To us that necessarily means, in this manufacturing contract, that the making of prints was an "intended use" for which the film was furnished. The remaining issue is whether a substantial portion of the film plaintiff received was unsuitable for that purpose.

III

In determining whether the microfilm was so defective, with respect to print-making, as to constitute a breach of the AGP warranty, our starting point is the finding of the Armed Services Board of Contract Appeals that "a large number of the prints were of poor quality and could not be used", and that, "although there was some conflict in the evidence we believe that it clearly supports appellant's [plaintiff's] contention that it [the microfilm] was not suitable for making prints." The Board's legal conclusion rested on this factual premise; after making the latter finding, the opinion continued, "The real issue then is whether or not the making of prints was one of the intended uses." In Part II, supra, we have disagreed with the Board's negative answer to this legal question. Its factual finding on the issue of suitability for print-making thus becomes crucial.[21] Under the Wunderlich Act, 41 U.S.C. § 321, this factual underpinning may be overturned only if found to be arbitrary, capricious, so grossly erroneous as to imply bad faith, or unsupported by substantial evidence.

In ascertaining whether the Board's finding is well-grounded, we distinguish between the legibility and accuracy of the microfilm itself and of the prints made from the film. The microfilm passes muster as "suitable" only if the properly-made prints also do so. The essential question is whether readable

---

20. The damages apparently sustained by the plaintiff in reworking microfilm amounted to a very significant percentage of the contract price. Plaintiff claims the cost of performance was increased by $225,793.83; the total contract price was about $798,300.00. Before the Board, Government counsel "conceded" "that if the claim is justified, it will be a substantial one * * *." Tr. p. 8. The Government has not shown that the plaintiff underestimated its costs. The low bids were reasonably close together. Tr. p. 16. Cf. Topkis Bros. Co. v. United

States, supra, 297 F.2d at 541–542, 155 Ct.Cl. at 657–659.

21. It is true that the Board also stated that "some of the film produced excellent prints." However, in view of the fact that the Board fashioned its opinion around its basic finding of unsuitability for print-making, this later statement cannot be read as suggesting anything more than that while, in the Board's view, the whole was generally unsuitable for that purpose, it was not 100% so.

prints were made or could be made from the film. The plaintiff predicates its case on the fact that as to 75% of the prints either all new tracing or considerable reworking was required. We think that, in finding the microfilm "not suitable for making prints", the Board accepted plaintiff's position in this respect. The parties sharply contested the issue of suitability below, but there is ample evidence supporting the Board's finding.

To demonstrate unsuitability for print-making, the plaintiff relied principally on a thorough study of the prints it made from the microfilm, and on the testimony of one of its top engineers (who had conducted the study). The burden of this evidence was that, of some 3,000 prints, 2,194 required reworking (gathering information by measuring disassembled parts, examining microfilm frames in a viewer, and penciling in the results, etc.), 305 had to be newly traced from scratch (allegedly because microfilm frames were missing), and 505 were usable.[22]

The Government countered in two ways at the Board trial, and adheres to these basic positions now. It considered the real issue to be whether the microfilm itself was legible or not, as contrasted to the prints (a position we have rejected in Part II, supra). Its chief witness (after examining the microfilm) testified that the film itself was essentially sound, and that, in his opinion, only 2% (about 50 frames) of the microfilm was bad. Defendant also insisted that, even if the legibility of prints was the focal problem, plaintiff's figures were not an accurate reflection of the facts. The contention was that there was an inherent reduction in readability in the process of making prints from film; that plaintiff's count of "reworked" prints did not show whether the touching-up in each instance was significant or not (and it often may not have been); and that most of the allegedly missing prints were either actually furnished or could not properly be considered part of the set of microfilm the Government had to supply.

■ The pros and cons of the parties' respective contentions could be mulled over in extenso.[23] That is not necessary, however, since all we have to decide is whether the Board's finding was sufficiently supported, not whether it was right. Even from what we have outlined it is clear that the finding must be upheld. Defendant's central contention that only 2% of the microfilm itself was illegible has no bearing on the issue of the condition of the prints. Beyond this, we have canvassed the entire record— we have reviewed side by side the charges and countercharges raised and supported by the testimony and evidence, compared prints with retraced drawings of parts, and examined parts lists and other exhibits—and have found nothing

22. Plaintiff was furnished approximately 2,700 separate frames of microfilm. However, these 2,700 frames represented only about 2,000 drawings since some drawings occupied more than one frame. Plaintiff claimed that several hundred frames were missing, while defendant said that the parts covered by those frames should have been purchased from subcontractors.

23. For example, one could debate whether our holding that the microfilm was warranted as suitable for making prints necessarily means that any reduction in readability in making prints from the film was a risk to be borne by the Government. Similarly, there are merits and demerits on both sides of the question of the extent of "reworking" done by the plaintiff. Some "reworked" prints revealed extensive corrections, others showed fewer. Testimony as to whether high-salaried engineers or less-skilled draftsmen had to do the reworking was conflicting. Finally, there is a broad area for difference of opinion in connection with testimony and evidence (mainly appellant's [plaintiff's] exhibits 18 and 102) relating to drawings for the "tuning gear mechanism"—the "57241 series" of prints.

to persuade us that the finding of the Armed Services Board of Contract Appeals that the film was unsuitable for making prints is arbitrary, capricious, or unsupported by substantial evidence. On the basis of all the evidence (primarily, the plaintiff's study of the prints and the incidental testimony) the Board could reasonably conclude that (at the least) 75% of the film was not good enough to yield readily legible manufacturing prints, and that, as a whole, it could not be considered suitable for that purpose. As we have held in Part I, supra, the Schedule article defined and partly limited the AGP warranty so that the defendant's obligation was to furnish substantially complete and accurate film which would produce readable prints. The defective microfilm given to the plaintiff was not substantially complete and accurate in that respect, and the defendant's supplying of that grade of film entitled Thompson Ramo to monetary relief.[24]

■ The plaintiff is entitled to an amount in the nature of the equitable adjustment which the Board should have granted. This amount will be determined in proceedings before the trial commissioner since the Board proceedings were explicitly confined to the issue of liability. See Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 863–864, 162 Ct.Cl. 802, 808–809 (1963), and succeeding cases.

The defendant's motion for summary judgment is denied and the plaintiff's is granted. The plaintiff is entitled to recover, and judgment is entered to that effect. The amount of recovery will be determined under Rule 47(c).

24. Since there was adequate evidence demonstrating that 75% of the film was unsuitable, we need not decide what lesser percentage, if any, would be substantial enough to constitute a failure of the warranty. At present, we leave that problem, raised by the defendant, for solution on a case-by-case basis (as we do in many other situations). Cf. Otis Elevator Co. v. United States, Ct.Cl., 356 F.2d 157, 158, decided February 18, 1966.