CUBIC CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 604–88C.

United States Claims Court.

June 6, 1990.

As Corrected June 12, 1990.

Sheldon I. Matzkin, Chevy Chase, Md., for plaintiff. Gerson B. Kramer, of counsel.

Ruth A. Harvey, with whom was Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, and Thomas W. Petersen, Washington, D.C., for defendant.

## OPINION

ROBINSON, Judge.

This is a direct access suit brought under 41 U.S.C. § 605(C)(5). Plaintiff's complaint alleges that defendant failed to pay interest on its certified claim, submitted as a Request for Equitable Adjustment (REA) to the contracting officer at the Electronic Systems Division (ESD) of the Air Force on March 28, 1986. This claim as amended was settled for the sum of $10,693,845. Plaintiff's submission was made pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §§ 601 *et seq.* In this case plaintiff seeks $1,956,038, the amount of interest due on the amount paid for the period between claim submission and when payments were made.

This matter is before the court on defendant's motion to dismiss filed April 25, 1989, pursuant to RUSCC 12(b)(1) and (h)(3), alleging that this court lacks subject matter jurisdiction. After trial, the parties completed briefing of the issues presented. For the reasons hereinafter assigned, the court will deny defendant's motion to dismiss.

### Factual Background

On March 6, 1984, the ESD of the Air Force Systems Command, Hanscom Air Force Base (AFB), Massachusetts awarded to plaintiff a fixed price incentive contract, Contract No. F19628–84–C–0073, for the manufacture and supply of an advanced radar training set (ARMTS) programmable organizational maintenance procedure (PROMPT) hardware system, PROMPT computer software, PROMPT courseware, together with training element intermediate level hardware (TEIL), and various data, and other items, all for the sum of $12,265,067.

The contract required plaintiff to furnish to the Air Force a training device and system for maintenance of the airborne warning and control system aircraft (AWACS) radar. This was to be accomplished by developing an interactive data based software-directed system utilizing Government-furnished lesson plans and Government-furnished operations and procedures (O/Ps) that would be the primary content of the stored data base used for the training curriculum. The equipment was required to meet the performance requirements of the Prime Item Development Specifications (PIDS) which were a part of the contract.

The REA, submitted March 28, 1986, to the Contracting Officer (CO) at ESD, sought an equitable adjustment in the contract target cost and an increase in con-

tract price for the performance of tasks which plaintiff claims had been in dispute, in the total amount of $7,030,367. This sum represented an increase in the target cost from $11,044,146 to $18,074,513, and a commensurate increase in ceiling price. In addition, plaintiff reserved "its rights to supplement this request if and as necessary during the remaining contract period."

Plaintiff's REA was based upon its claim that the price adjustment was due to the deleterious impact of defective Government-furnished property (GFP) and Government-imposed changes. The REA cited the Changes, Government Property, and Government Delay of Work clauses of the contract. The claim letter was accompanied by a CDA certification, a standard form (SF) 1411 "contract pricing proposal cover sheet" and a large volume which discussed the claim in detail. On April 2, 1986, EDS, by letter, acknowledged receipt of the claim and indicated that it had begun an evaluation of the claim. Plaintiff amended or supplemented its REA a number of times increasing or decreasing the amount claimed. Addendum No. 3 to the REA dated October 24, 1986 brought the total amount claimed to $11,496,062.

After submission of the REA, the parties attempted unsuccessfully to negotiate a settlement of plaintiff's claim. These negotiations were ongoing when, on December 22, 1986, the Air Force by telegram terminated the balance of the contract for convenience. By letter dated January 15, 1987, plaintiff submitted an addition to its contract claim adding the sum of $2,390,-000 for under-absorbed overhead and G & A impacts flowing from the events recited in its claim.

By letter dated January 16, 1987, the Procurement Contracting Officer (PCO) directed that plaintiff incorporate all of its several equitable adjustment claims into a single submission and submit a single consolidated proposal containing only the actual expended amount up to the termination for the agency to consider and review. In response, plaintiff, on March 23, 1987, sent the PCO its consolidated equitable adjustment claim in an amount totaling $12,120,-

629, with attachments, claim summary, and SF 1411. In plaintiff's accompanying claim letter, it indicated that as of December 22, 1986, the termination date, it had expended $18,379,350 on the program, but had only been paid $8,082,478, leaving a balance due of $10,296,872.

On April 1, 1987, the Termination Contracting Officer (TCO) at Defense Contract Administration Services region, Los Angeles (DCASR–LA) advised plaintiff by letter that he was assigned sole responsibility for contract administration and review of plaintiff's claim.

Although plaintiff sought the TCO's approval of an interim payment plan pending completion of the TCO's review, this plan was rejected by letter dated June 15, 1987. Plaintiff responded in a letter dated July 8, 1987, noting that the CDA required that certified claims exceeding $50,000 be resolved within 60 days or the contractor be notified as to when a decision will be made. Plaintiff's letter, which noted the delays in defendant's evaluation of its claim advised that:

> Cubic will assert its right to interest on all monies due. This right includes interest on contract funds exceeding $10,000,-000 that have been expended but which we are unable to bill and receive due to delays in settling our claims.

In subsequent correspondence plaintiff renewed its requests for interim partial payment and prompt settlement of its REA claim and for resolution of the termination inventory and general termination settlement. Defendant's response was to initiate an audit of plaintiff's books and records and to meet with plaintiff's representatives to discuss an orderly procedure for resolving outstanding matters. In a letter dated March 1, 1988, plaintiff again indicated it would assert its right to interest and presented a table to DCASR–LA showing $1,856,007 as the amount of accrued interest claimed.

After further negotiations, by April 2, 1988, defendant had made partial payments of $5,064,000 ($1,133,155 against the base contract and $3,930,845 against the REA claim). The parties continued to negotiate

and by August 19, 1988 had resolved all issues except plaintiff's claim for interest on the equitable adjustment claim. The settlement resulted in payment to plaintiff of an additional $7,200,000 ($437,000 in termination expenses and $6,763,000 on the equitable adjustment claim exclusive of interest).

After the CO refused to issue a decision on the interest issue, the parties agreed to contract modification A00001 dated August 22, 1988, which excepted from plaintiff's release of defendant the question of interest. Plaintiff filed its complaint in this court on October 18, 1988 alleging that under § 12 of the CDA, 41 U.S.C. § 611, it is entitled to interest on its claim from the date it submitted its REA, which amounts to $1,956,038.

Defendant filed its motion to dismiss the complaint pursuant to RUSCC 12(b)(1) and (h)(3) alleging lack of subject matter jurisdiction. After the matter was fully briefed the court held a two-day evidentiary hearing at which both parties presented conflicting evidence regarding plaintiff's March 28, 1986 REA.

### The Contentions of the Parties

Defendant contends that plaintiff's REA did not comply with the requirements of the CDA[1] and therefore plaintiff did not submit a proper claim to the CO because:

1. No dispute existed when plaintiff submitted its REA since the parties were in "a pre-dispute negotiating posture;"
2. The REA did not request a sum certain;
3. The REA did not request a "final" decision of the CO; and
4. The REA was a routine request for "adjustment" rather than a claim as defined in the CDA and DAR 7–103.12 and was submitted as the first step in an uncompleted two-step process where the

request is converted into a "claim" by certain actions of the CO.[2]

Plaintiff contends defendant's motion is without merit because it rests upon erroneous factual assumptions and that contrary to defendant's assertions, the REA of March 28, 1986 was not a routine request for payment or adjustment. Plaintiff asserts its claim did request a sum certain, the Air Force did in fact treat the REA as a claim, and plaintiff had requested a specific contract adjustment which the Air Force denied prior to plaintiff's REA submission.

### The Evidence

The court has received substantial evidence in the form of correspondence, memoranda, notes, and the testimony of witnesses in an effort to resolve the factual disputes relating to these issues. That evidence will be carefully summarized and evaluated in this opinion.

Soon after the contract was entered into, plaintiff discovered that the actual lesson unit scripts provided were inconsistent with the equipment specifications. This meant that equipment which could run the lesson units would not meet PIDS, while equipment which met PIDS would not run the lesson units.[3] In addition, the actual lesson units furnished by the Air Force exceeded the sample units provided in the Request For Proposal (RFP) in terms of size, structure, duration and complexity.[4]

Under the contract, the Air Force was required to provide, in addition to the six lesson unit scripts furnished with the RFP, another 43 scripts and 72 O/Ps as Government Furnished Property (GFP) by the later of August 1984 or the Preliminary Design Review. When plaintiff received 16 lesson unit scripts and the 72 O/Ps on March 21, 1984, it discovered defects in the scripts which failed to meet the PIDS' re-

---

1. The CDA requires that all claims by a contractor against the Government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. 41 U.S.C. § 605.

2. Defendant asserts this process involves submission of a routine request for adjustment under the changes clause of the contract, and after

negotiations and a refusal by the CO to adjust the contract, the conversion of the routine request into a claim.

3. TR Vol. II, pp. I–2, 3.

4. TR Vol. II, p. I–4.

quirements. All O/Ps were inconsistent with the Technical Order requirements and did not contain sufficient detailed information to serve as the basis of software models.

The dispute concerning the O/Ps began at the Post–Award Guidance Conference held on April 10–11, 1984. When plaintiff pointed out deficiencies in the O/Ps, the Air Force responded that plaintiff had to work with what was provided to it. At the initial Courseware Working Group (CWG) meeting on April 24–25, 1984, plaintiff informed the Air Force that the lesson unit scripts provided in March, 1984 failed to comply with contract requirements in that no lesson unit included provision for more than 1,250 events. Plaintiff advised the Air Force that because of this failure, plaintiff would be required to perform more complex tasks and, therefore, use more experienced and greater numbers of personnel than anticipated based upon the RFP. At later CWG meetings in May and June of 1984, similar complaints were made with respect to defective GFP.

After the Air Force provided six more defective lesson unit scripts on July 18, 1984, plaintiff sought a six-week delay in performance of the Preliminary Design Review and Critical Design Reviews in part due to its need to determine how to deal with the defective lesson units. Although the CO granted this time extension in a letter dated August 20, 1984, he denied that there were problems with the GFP stating, "it is our contention that the length of the lesson unit scripts provided to you is within the bounds defined in the ARMTS Prime Item Development Specification."

The remaining lesson unit scripts which were received in September and October, 1984 were also defective. Plaintiff specified these defects in its letter of October 17, 1984.

Plaintiff's letter of March 25, 1985 to the CO detailed problems with the GFP, stated that the impact of those problems on its performance had been severe, and noted that the parties had earlier agreed to a plan "whereby Cubic would develop a list of

potential contract scope classifications and reductions to offset the cost and schedule impact of the lesson unit script effort." However, because no action had yet been taken to limit the impact of GFP, plaintiff asserted that:

> The ARMTS program has reached a critical point and orderly completion of the contract mandates that an agreement on the lesson unit issue be reached in the very near future. We would prefer that it be accomplished through the methods we have proposed rather than a separate request for equitable adjustment pursuant to the Government Furnished Property Clause of the Contract.

On June 4, 1985, the CO advised plaintiff that if it asserted that the GFP was defective "formal notification of conduct which Cubic considers a change to the Contract should be promptly reported in accordance with the [Notification of Changes] Clause." Plaintiff responded by letter of July 26, 1985 advising the CO that its letter of October 17, 1984 constituted such a notification of changes and that "we are currently preparing a detailed claim...." The CO responded that same day, July 26, 1985, by stating "the subject Contract is not progressing in a satisfactory manner" and "the Government is considering withholding progress payments."

In a letter dated August 8, 1985, plaintiff detailed the impact of the defective GFP on its contract performance, stating that the information was intended to "formally present Cubic's position and rationale attending the pending claim," that more information would be presented later, and that the defective GFP constituted a contract change entitling plaintiff to an equitable adjustment in the contract price and schedule. Several days later plaintiff again wrote complaining about the defects and delay in delivery.

On September 7, 1985 the CO informed plaintiff:

> We do not agree with your evaluation that the GFP provided was defective. The Government's analysis indicates that the lesson units provided in the RFP not only were representative samples of the

GFP but also provided the intent, structure and content of the lesson scenarios [sic].

On September 12, 1985, plaintiff again confirmed to the CO that "the impact of defective GFP has invaded all performance areas," and that plaintiff could not eliminate references in its letter to "potential claims" arising from the GFP.

In a letter dated October 1, 1985, plaintiff advised the CO that although it understood he did not agree that defective GFP had been provided, plaintiff stood by that position and that information "to be presented *in our claim* will establish both that the GFP was defective and not suitable for its intended use and the substantial impact to program schedule and cost." (Emphasis added.)

On November 19, 1985, plaintiff sent to the CO a lengthy letter outlining its interpretation of the contract concerning GFP, pointing out in detail how the GFP actually furnished differed from the requirements of PIDS. Plaintiff requested "the direction of the CO as to the approach to be taken at this critical juncture in the program."

On February 5, 1986, the CO responded to plaintiff's letter identifying "seven distinct elements of the subject issue" of defective GFP, reviewing each element and stating the Government's contrary interpretation and disagreement with plaintiff's interpretation of the contract.

Plaintiff's March 28, 1986 REA had a cover letter asserting a claim for equitable adjustment under the changes, Government Property and Government Delay of Work clauses of the contract, seeking an adjustment to the Contract's Target Cost in the amount of $7,030,367 and a commensurate increase in ceiling price. The REA also contained a certification in accordance with the CDA and was accompanied by a large volume containing details of plaintiff's claim.

After submitting the REA, plaintiff amended the amount claimed three times to correct later discovered discrepancies, to adjust labor allocations, and to omit or add expenditures and impacts. Following the third amendment, the CO on November 21,

1986, wrote to plaintiff requesting additional information and raised questions about the three amendments. The CO's letter stated:

In light of the fact that addenda 1, 2, and 3 cover the same issues and time frames, *the Government needs to be able to track addendum 3 back to the original claim.* For example, how are the claim issues in addendum 3 related to the claim issues in the original REA? (Emphasis added.)

After plaintiff received the Government's notice of termination for convenience dated December 22, 1986, plaintiff on January 15, 1987, asserted an added certified claim for $2,390 for underabsorbed overhead and general and administrative expenses. The CO on January 16, 1987, wrote plaintiff asking that plaintiff consolidate its original claim and addenda into a "single consolidated proposal encompassing all current claims under the contract. This will result in an expeditious resolution of subject claim." The CO's letter also requested recertification of the claim.

Plaintiff's consolidated claim was submitted on March 23, 1987, accompanied by the required CDA certification. After receiving no decision on its March 23, 1987 REA, it advised the Government in letters dated June 24 and July 8, 1987, that it would seek interest and on July 24, 1987, it reiterated its request of May, 1987, for partial payment against the contract due to the delay in resolving its claims.

On August 18, 1987, the ESD provided the TCO with its initial evaluation of plaintiff's claim. Subsequently, the Air Force issued a technical evaluation supplementing the initial evaluation, initiated an audit of plaintiff's books and records, and met with plaintiff's representatives to attempt to work out an order of procedure for resolving the outstanding matters.

On March 1, 1988, plaintiff again indicated it would seek interest on its claims and presented a table calculating the amount of accrued interest due. After negotiations, the Government made partial payments to plaintiff of $5,064,000, which

included $3,930,845 against the equitable adjustment claim on March 23, 1988, and $5,058,936 on April 2, 1988. Negotiations continued and the question of interest on plaintiff's claims first arose. All other issues were resolved and a total additional payment to plaintiff of $7,200,000 was made on September 12, 1988, representing $437,000 in termination settlement expenses and $6,763,000 on plaintiff's equitable adjustment claim exclusive of interest. Thus, plaintiff has collected a total of $10,693,845 on its equitable adjustment claim consisting of the interim payment of $3,930,845 and the final payment of $6,763,000.

## DISCUSSION

 For the purposes of a motion to dismiss for lack of subject matter jurisdiction pursuant to RUSCC 12(b)(1), the court must accept as true any undisputed allegations of fact made by plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Where there are disputed facts relevant to the issue of jurisdiction, the court is required to decide those facts. *Reynolds v. Army and Air Force Exchange Service*, 846 F.2d 746, 747 (Fed.Cir.1988); *Hedman v. United States*, 15 Cl.Ct. 304, 306 (1988). The burden is on plaintiff to establish jurisdiction. *Metzger, Shadyac & Schwartz v. United States*, 10 Cl.Ct. 107, 109 (1986). Furthermore, "[i]f the motion involves a factual attack on the jurisdictional allegations in the complaint, the court may receive competent evidence to resolve the factual dispute." *Land v. Dollar*, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Solar Turbines, Inc. v. United States*, 16 Cl.Ct. 304 (1989).

 The Contract Disputes Act requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a final decision." 41 U.S.C. Section 605(a). This requirement is a jurisdictional pre-requisite in the Claims Court. *Gardner Machinery Corp. v. United States*, 14 Cl.Ct. 286, 290 (1988). In short, there are four elements necessary for a proper claim submission: a

claim, in writing, sent to the contracting officer, requesting a final decision.

Plaintiff's contract incorporated the Disputes Clause of DAR 1–103.12(c) as follows:

(a) This contract is subject to the Contract Disputes Act of 1978 (P.L. 95–563).

(b) Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved in accordance with this clause.

(c)(1) As used herein, "claim" means a written demand or assertion by one of the parties seeking, as a matter of right, the payment of money, adjustment, or interpretation of contract terms, or other relief, arising under or relating to this contract. However, a written demand by the contractor seeking the payment of money in excess of $50,000 is not a claim until certified in accordance with (d) below.

(2) A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim for the purposes of the Act. However, where such submission is subsequently disputed either as to liability or amount or not acted upon in a reasonable time, it may be converted to a claim pursuant to the Act by complying with the submission and certification requirements of this clause.

 No particular language is required to create a claim. All that is needed is that the contractor supply in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim. *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987). The relevant factors in this analysis are whether the contractor asserted specific rights, requested specific relief, and requested the contracting officer to render a final decision. *See Tecom, Inc. v. United States*, 732 F.2d 935, 936 (Fed.Cir.1984); *see also Mendenhall v. United States*, 20 Cl.Ct. 78 (1990). Courts generally interpret the CDA as requiring a claim to state a sum-certain

amount. *Z.A.N. Co. v. United States,* 6 Cl.Ct. 298 (1984). However, a claim in which the amount in dispute can be determined by a simple mathematical calculation or from the contractor's submission to the contracting officer is sufficient. *Metric Construction Co., Inc. v. United States,* 14 Cl.Ct. 177, 179 (1988).

Section 12 of the Contract Disputes Act provides that Government contractors are entitled to interest on amounts found due on claims from the date such claims are submitted. 41 U.S.C. § 611. If the REA as submitted on March 28, 1986 was properly submitted as a claim under the CDA, plaintiff is entitled to the interest it seeks on the amount of the settlement sum or $10,693,845 to an agreed upon date. Thus, interest is not now accumulating, although delay in payment of any interest which may be due plaintiff is costing plaintiff the loss of use of that interest. If plaintiff's submission is found insufficient and is not a valid claim under the CDA, the question then arises as to whether any subsequent submissions by plaintiff constituted a cognizable claim under the CDA.

Because there were factual issues in dispute relating to the subject matter jurisdiction of this court, an evidentiary hearing was held on November 14 and 15, 1989, to receive testimony from the parties' witnesses respecting the issues presented. *See Land v. Dollar,* 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Solar Turbines, Inc. v. United States,* 8 F.P.D. ¶ 14, 16 Cl.Ct. 304 (Cl.Ct.1989). That testimony will be discussed in this opinion only to the extent that it sheds light on these issues.

■ Generally, there must be a "dispute" before there can be a claim. *See Hoffman Construction Co. v. United States,* 7 Cl.Ct. 518, 523 (1985). The correspondence and plaintiff's witnesses' testimony convincingly support the conclusion that at the time plaintiff submitted its REA, the parties were in a full-fledged dispute, not in a pre-dispute negotiating posture. The correspondence and meeting memoranda reflecting the many negotiating sessions which preceded the March 28, 1986 REA show that plaintiff had exhausted every reasonable effort through many negotiating sessions with Government officials to avoid the filing of a formal claim under the CDA. A thorough and detailed analysis of these documents contained in plaintiff's volumes I and II to its Opposition to Defendant's Motion to Dismiss show that the "dispute" over the adequacy of the GFP began as early as April, 1984, with notice to the Air Force that the lesson unit scripts did not comply with contract requirements and that this would cause plaintiff to accomplish more tasks and use a greater number of personnel than anticipated based upon the RFP.

Plaintiff's exhibits show that the Government's position—dating from the CO's letter of August 20, 1984 agreeing to a time extension—was adamant that there was not any problem with the GFP. Plaintiff's letter of March 25, 1985 indicates that a "critical point" had been reached in its disagreement with the Government over the lesson unit scripts and that while it would prefer to resolve the dispute by adoption of its suggested methods for accomplishing this, it was prepared to submit an REA. The Government's response on June 4, 1985 was totally inadequate, necessitating plaintiff's response of July 26, 1985 notifying defendant that "we are currently preparing a detailed claim for the repair effort." The CO's cover letter of July 26, 1985, which threatened plaintiff with withholding of progress payments, is a very persuasive indication that an impasse was reached. Rather than give in to this threat, plaintiff continued to press its claim by letter in August, 1985.

If there was ever any doubt about the existence of a dispute, that doubt was laid to rest by the CO's letter of September 7, 1985 which reiterated its position that the GFP was not defective in any respect. He stated "[t]he Government's analysis indicates that the lesson units provided in the RFP not only were representative samples of the GFP but also provided the intent, structure and content of the lesson senerios [sic]." The remaining correspondence exchanged between the parties prior to the

plaintiff's March 28, 1986 REA simply reaffirmed the parties positions.[5]

The testimony of plaintiff's witnesses also supports the conclusion that the REA was not submitted as part of a pre-dispute negotiating process. Plaintiff's project manager, Robert C. Draper, an electrical engineer with over 23 years of experience in the electronics field who was assigned to the ARMTS contract in 1983, and who wrote the technical portion of the program, testified that the Air Force's consistent position from June 1984 forward was that the additional work necessitated by the defective lesson unit scripts was within the contract and no additional scope of work would be allowed. He further testified that the CWG was unsuccessful in obtaining compatibility of the scripts with plaintiff's design. Also, he testified that it took two years to clean up errors in logic and design and that defendant consistently refused to accept responsibility for payment for this work.

Mr. James B. Jenkins, plaintiff's Vice President of Contracts, a Cubic employee for over 23 years and an expert in the field of Government contracts, testified that when he became involved in the ARMTS dispute in June, 1985, the tone of the correspondence had already become contentious. He testified that meetings in 1985 turned out to be frustrating and nonproductive because of the Government's actions and refusal to acknowledge any responsibility and liability for defective GFP.

Mr. Robert C. Hill, who had many years of experience in Government contracting with the Army and Navy and had taken all of the DOD's courses in procurement, contract administration, pricing and contract law prior to his employment as plaintiff's Senior Contract Administrator, testified that after his assignment to the ARMTS contract in February, 1985, he kept a notebook of his activities involving the handling of customer correspondence and advising of company personnel. That notebook described his contacts with Government representatives from February 1985 to April 1986. His testimony revealed discussions regarding a downscoping proposal to mitigate the effect of the defective GFP which was never acted upon and a June 6, 1985 briefing at which plaintiff was urged to formally state its case if it felt that it had a "claimable issue." Pursuant to the oral requests at the briefing of Col. McCabe and General Cabell, who were senior representatives of defendant, Hill testified he presented a draft of the claim (Exhibit 52) which was sent by fax to ESD on July 15, 1985, and received by ESD on July 16, 1985. Subsequently, both Col. McCabe and Major Escarzaga, another Government official, said that a formal claim was needed and further discussions would not be fruitful, implying that plaintiff would have to "go to the mat" on this issue.

Under the Government's threat of withholding payments and at the Government's request, plaintiff prepared several cost recovery plans, all of which were rejected. The rejections objected to references to "potential claims" because such claims should be handled as "separate contract issues." Plaintiff's response was that it could not divorce the claims from the cost recovery plan because its costs were directly related to the defective GFP, the responsibility of the Government.

The Government's response to plaintiff's interpretation letters led to the critical design review stage of plaintiff's performance and was entirely negative. Hill testified that on March 14, 1986, he received a call from Mr. LeBow, a Government contract official, inquiring about plaintiff's schedule for submission of its claim, indicating he had some planning to do of his own. At no time did General Cabell, Col. McCabe or Mr. LeBow ever characterize plaintiff's claim as a routine request for payment or adjustment.

Mr. Gary Whaley, Director of Contracts for plaintiff, testified he had 24 years of experience with General Dynamics before serving 10 years with plaintiff in the area of contracts administration. He stated he

---

**5.** *See* CO's letter of September 1985, Vol. I, Tab 12; Plaintiff's letter of September 12, 1985, Vol. I, Tab 13; Plaintiff's letter of October 1, 1985, Vol. I, Tab 14; Plaintiff's letter of November 19, 1985; and CO's letter of February 5, 1986, Vol. I, Tab 16.

was first assigned to the ARMTS contract in April, 1985. He testified that the transmission of the informal claim to Colonel McCabe contained no monetary amount because plaintiff's costs were not subject to quantification until it was determined how the problem would be solved. He testified further that the informal claim letter was sent to bring a higher level of focus to bear upon the problem.

The testimony of plaintiff's witnesses was highly credible and persuasively presented. That testimony and plaintiff's exhibits showed convincingly that plaintiff's unsuccessful efforts to obtain governmental agreement regarding the defective GFP issue was fairly pursued at all times with diligence and candor. At no time did the CO or other government personnel indicate any degree of retreat from a hard and fast denial of responsibility for having furnished defective property or that at any time it might open the door to the possibility of a successful settlement of the dispute.

Defendant's witnesses' testimony with regard to the existence of a dispute prior to March 28, 1986 is simply not credible. Major Costello's testimony at trial did not contravene plaintiff's evidence in this regard to any material degree. To the extent it did, plaintiff's testimony is more credible. In fact, Major Costello's testimony shows that as the CO, he received full disclosure through detailed correspondence received from plaintiff's officials and in meetings with plaintiff's representatives that defective Government lesson unit scripts had been furnished. As early as August, 1985, the date of plaintiff's letter to Col. McCabe, he could have simply admitted the defective nature of the scripts and directed plaintiff to proceed under the Changes Clause of the contract so that the Government could determine the payment due. Apparently little or no additional information from plain-

tiff was necessary in August, 1985 for Major Costello to have taken this action.[6]

Moreover, defendant's witnesses Major Costello and Captain Gray did not testify that the REA was a routine request for payment. In fact, Captain Gray's testimony was persuasive that the REA was exactly what plaintiff maintains it was—"a request to adjust the contract terms and conditions associated with defective Government-furnished property."[7]

Based upon the correspondence described above, the credible testimony of plaintiff's witnesses, the total lack of credible rebuttal evidence from defendant, and the entire record before this court, the court finds that the parties were not in a pre-dispute posture prior to plaintiff's submission of its REA on March 28, 1986, but that the parties had reached a total impasse by that date, which left plaintiff with no choice but to submit a formal claim.

### The Request For Equitable Adjustment

■ Plaintiff's prior requests and its REA of March 28, 1986, were based upon the standard warranty in the Government Furnished Property Clause that materials "suitable for use" will be supplied by the Government or the Government will be liable for any added costs or time caused by the failure to supply such items. *Thompson Ramo Woolridge, Inc. v. United States*, 175 Ct.Cl. 527, 361 F.2d 222 (1966); *Topkis Bros. Co. v. United States*, 155 Ct.Cl. 648, 297 F.2d 536 (1961).

It is abundantly clear to the court that plaintiff's REA was not a voucher, invoice, or other routine request for payment because the premise upon which the REA was based was clearly in dispute when the REA was submitted. Although plaintiff had made routine requests for payment prior to March 28, 1986, its REA was submitted under the changes clause because

---

**6.** It is difficult for this court to understand why Major Costello did not admit to the defective nature of the scripts in 1985. Unfortunately, his adamant refusal to acknowledge the merits of plaintiff's claim significantly delayed resolution of that claim and ultimately resulted in sizeable and shocking additional costs to the Govern-

ment. Of course, if Major Costello's unjustified response resulted from decisions made by his superiors, then obviously he is not solely to blame for the disastrous consequences which followed.

**7.** TR 223.

the contract's GFP clause required the *procedures* of that clause to be used as the avenue of administrative relief.

Had defendant regarded plaintiff's REA as a routine request for payment it would logically have promptly paid the amount claimed as an undisputed "contract payable" without further negotiation or argument. It did not do so, but continued its vigorous denial of any liability to plaintiff, supporting the court's conclusion that the Government regarded the REA as a claim under DAR § 7–103.12(c)(1).[8] Therefore, based upon plaintiff's evidence which was not effectively rebutted, the court finds that plaintiff's REA of March 28, 1986 was submitted under the contract's Changes Clause as an affirmative claim which was in dispute.

The Contract Dispute Act (CDA) does not define the word "claim." However, plaintiff's REA used the same terms that appear in the definition of "claim" in the Disputes Clause in the contract. Plaintiff's REA was a request for an "adjustment" of "contract terms arising under or relating to the contract." The use of these words of art was not a coincidence but a calculated effort by plaintiff to comply with the express language found in the Disputes Clause.

Further, subsection (d) of the DAR regulation provides:

> For contractor claims of more than $50,-000, the Contractor shall submit with the claim a certification that the claim is made in good faith; the supporting data are accurate and complete to the best of the Contractor's knowledge and belief; and the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable. . . .

This language duplicates in general the certification requirements of § 6(c)(1) of the Contract Disputes Act, 41 U.S.C. § 605(c)(1). As plaintiff notes, this uniformity of language is significant because both define a claim in terms of a "contract adjustment."

Plaintiff's certification of its March 28 submission states:

> Cubic Corporation certifies that its claim for equitable adjustment, Cubic No. 380–2 dated March 28, 1986, is made in good faith, that the supporting data is accurate and complete to the best of Cubic's knowledge and belief and the amount requested accurately reflects the contract adjustment for which Cubic Corporation believes the Government is liable.

Plaintiff's use of these words of art evinces its intent to file a properly certified claim under the CDA, applicable regulations, and the Disputes Clause of the contract in submitting its request to the CO for an adjustment.

Plaintiff did not intend to foreclose further settlement negotiations by its REA claim submission. In fact, plaintiff meant to obtain a decision from the CO, or to initiate and encourage the settlement of its dispute in order to obviate litigation. *Paul E. Lehman Inc. v. United States*, 230 Ct.Cl. 11, 673 F.2d 352, 354 (Ct.Cl.1982); *Metric Construction Co. v. United States*, 1 Cl.Ct. 383 (1983). The fact that plaintiff continued to negotiate in good faith with defendant and was able to finally reach a voluntary agreement on the merits of its claim strongly supports its allegation as to the legitimate fundamental purpose which motivated its submission.

 Plaintiff's REA admittedly contained no specific demand for a contracting officer's decision, but there is no statutory or in this case contractual requirement for such a demand.[9] The REA contained a

---

8. Plaintiff is not claiming interest under the Prompt Payment Act, PL 97–177, (May 21, 1982). Therefore, there is no need for the court to consider whether plaintiff may be entitled to compound interest under that Act for the Government's refusal to pay plaintiff for over two years following submission of the REA, assuming *arguendo* that it was a routine request for payment.

9. Plaintiff's REA was worded in such a way that it was obvious it was requesting a decision by the contracting officer. *See Mendenhall v. United States*, 20 Cl.Ct. 78 (1990). In fact, defendant believed it was a request for a decision when it was received. Defendant's reliance on *Hoffman Constr. Company v. United States*, 7 Cl.Ct. 518 (1985) is misplaced. The letter which allegedly

proper CDA certification. By its very nature the plaintiff's submission was a request for the contracting officer's decision. *Alliance Oil and Refining Co. v. United States,* 13 Cl.Ct. 496 (1987). The court finds that there was no procedural deficiency in plaintiff's REA because it lacks such a specific demand. Indeed, while a specific request for a final decision is a factor to be considered in determining whether a "claim" was submitted, *Tecom Inc. v. United States,* 732 F.2d 935, 936 (Fed.Cir. 1984), it is the only factor which arguably could be missing under the facts of this case. While plaintiff did not specifically use the words "final decision," it clearly was such a request and, in fact, all parties involved interpreted the REA as requesting a final decision from the contracting officer. *E.g., Mendenhall v. United States,* 20 Cl.Ct. 78 (1990).

Another factor to be analyzed is whether Cubic asserted specific rights and requested specific relief in its REA. *Tecom, Inc. v. United States,* 732 F.2d 935, 936 (Fed. Cir.1984). The language in plaintiff's REA clearly demands specific relief and asserts specific rights. The REA is replete with such references, and to analyze each demand for relief and assertion of rights in further detail would be a needless waste of time and resources.

■ Plaintiff's REA on its fixed price incentive contract sought an "increase in target cost of $7,030,367 ... and a commensurate increase in ceiling price." Commensurate means "equal in measure or extent." *Webster's New International Dictionary, 2nd Ed.* No complex mathematical calculation is needed to determine the total monetary effect on the contract price. *See Metric Construction Co. v. United States,* 14 Cl.Ct. 177, 179 (1988); *Z.A.N. Co. v. United States,* 6 Cl.Ct. 298 (1984). Indeed, plaintiff's cover letter to its REA states "Cubic requests an increase in target cost of $7,030,367 from $11,044,146 to $18,074,513 and a commensurate increase in ceiling price.... The required certification is attached to this letter." Thus, plaintiff's claim was for a sum certain.[10] There is no merit to defendant's contention that the REA was deficient in this regard. *Tecom, Inc. v. United States,* 732 F.2d 935 (Fed.Cir.1984). Moreover, the initial certification would reasonably be expected to cover any supplements to the claim. *Camden Securities Co.,* PSBCA, 85–1 BCA ¶ 17,718; *Central Industrial Electric Co.,* GSBCA, 83–1 BCA ¶ 16,273. As a result, plaintiff has met almost all, if not all, of the factors which cases hold are indicative of whether a proper claim has been filed under the CDA.

Defendant contends plaintiff's certification of its REA was made only to comply with the certification requirements of Section 813 of the DOD Appropriation Authorization Act and not to comply with the CDA's certification requirements. However, the contract contained DOD certification clause DAR § 7–104.102 (Feb.1980) which states:

> (d) In those situations where no claim certification for the purposes of Section 813 has been submitted prior to the inception of a contract dispute, *a single certification, using the language prescribed by the Contract Disputes Act* but signed by a senior company official in charge at the plant or location in-

---

constituted the claim in *Hoffman* read, in part, "[w]e would like to meet in the near future with you or with someone with the authority to resolve these items." That letter clearly is a request for further negotiation, and did not specify relief desired, identify in any manner the amount of compensation requested, nor could it have been interpreted to request a decision. However, plaintiff's REA in this case demanded specific rights, requested a sum certain, and by its very nature requested a decision by the contracting officer. This court finds as a fact, after trial, that defendant believed it was a fully compliant "claim" within the meaning of the CD, that defendant interpreted plaintiff's REA as re-

questing a decision, which encompassed the interest issue, from the contracting officer, and that it had adequate notice that it was a CDA "claim." The *Hoffman* case is therefore distinguishable.

**10.** Although plaintiff's cover letter reserved the right to supplement its claim during the balance of the contract period, this does not mean that the claim was not for a sum certain. In fact, the claim was an on-going one with a continuing cost impact and effect which logically would require supplementation through addenda.

volved, *will be deemed to comply with both statutes.* (GX–6) (Emphasis added.) This provision makes clear that plaintiff's certification fully complied with both Acts' requirements. Defendant has submitted no evidence supporting its assertion with respect to plaintiff's reason for making the certification. Further, by failing to cite the full text of this contract clause, defendant has left itself open to the serious charge of intentional misrepresentation which plaintiff made in its footnote reference on page 6 of its Post Trial Memorandum. In any event, the court completely agrees with plaintiff's analysis that defendant's contention is unsupported by the evidence and is contrary to the clear language of Section (d) of the contract. Consequently, the court finds that plaintiff's REA was properly certified as required by the CDA.

The GFP clause in the contract is of significant impact in this case. In essential part, paragraph (a) states:

> Except for Government-furnished property furnished "as-is," in the event the Government-furnished property is received by the Contractor in a condition not suitable for the intended use the contractor shall, upon receipt thereof, notify the Contracting Officer of such fact and *as directed by the Contracting Officer,* either (i) return such property at the [G]overnment's expense or otherwise dispose of the property or (ii) effect repairs or modifications. *Upon the completion of (i) or (ii) above,* the Contracting Officer upon written request of the contractor shall equitably adjust the delivery or performance dates or the contract price or both ... (Emphasis added.)

The contracting officer in this case received written notices via plaintiff's pre-claim correspondence that the lesson unit scripts were so defective that performance was not possible under the contract. The CO involved should have followed the procedures established in this clause and directed plaintiff to either return the scripts at defendant's expense or otherwise dispose of the scripts or effect repairs or modifications. Had the CO instructed either of these things, the entire cost of compliance would have been at the Government's ex-

pense since plaintiff would have had a right to insist upon an equitable adjustment in delivery or performance dates, the contract price, or both. The contracting officer wholly failed in his duty to properly respond to such notices and the REA. He should have directed plaintiff's actions under authority of this clause or affirmatively denied that the scripts were defective, and acknowledged that the REA was a claim. The application of this clause under the circumstances of this case is certainly not "routine" in any sense.

Plaintiff's purpose in submitting the REA was to settle the dispute over the GFP by obtaining a modification agreement authorizing funding for the claim, but if defendant persisted in its disavowal of responsibility for having furnished defective GFP, to get its claim filed under the Disputes clause so that it would be entitled to interest on the claimed amount. Defendant's position seems to be that it may, in its discretion, regard an REA as merely a routine matter which imposes no obligation upon it to take any particular action. The court rejects this position as being devoid of logic, without support, and in conflict with the basic purposes of the CDA. In fact, the position of both the ENGBCA and the Office of Federal Procurement Policy (OFPP) would appear to be directly contrary to defendant's interpretation of the Disputes and Changes clauses in the contract and in the CDA. *R.G. Beer Corp.,* ENGBCA No. 4885, 85–2 BCA ¶ 18,162. The court finds that neither the CDA nor the contract required that the contractor's claim be specifically submitted under the disputes clause in order to be a conforming CDA claim. This conclusion is not in conflict with the Federal Circuit's decision in *Mayfair Construction Co. v. United States,* 841 F.2d 1576 (Fed.Cir.1988). In *Mayfair,* a different disputes clause was involved. Moreover, in *Mayfair,* the board found that the parties were not involved in a dispute but were in a pre-dispute, negotiating posture. In this case, there was a long standing dispute prior to the submission of the claim.

It is noteworthy that the contracting officer wrote letters describing plaintiff's REA as a claim. Following plaintiff's third addendum to its REA, the contracting officer wrote:

> In light of the fact that addenda 1, 2, and 3 cover the same issues and time frames, *the Government needs to be able to track addendum 3 back to the original claim.* For example, how are the *claim issues* in addendum 3 related to the *claim issues* in the original REA? (Emphasis added.) [11]

Additionally, from Captain Gray's testimony on direct, it is clear that he regarded plaintiff's REA as a pending claim requiring resolution whether or not the contract had been terminated for convenience by the Government. TR 308.

Mr. Jenkins' unrebutted testimony respecting his conversation with Mr. David Williams, ESD's head of contracts, after filing of the REA and Mr. Williams' admission that the REA was a claim affords further support for plaintiff's contention that the REA was a valid and compliant Disputes Act claim and the contracting officer regarded it as such. In any event, plaintiff, at the contracting officer's request, resubmitted its disputed claims as a "single consolidated proposal encompassing all current claims under the contract" on March 23, 1987. Although not material in view of the court's determination with respect to the March 28, 1986 submission, there can be no question that this later filing was also fully compliant with the CDA and the Disputes clause of the contract.

## CONCLUSION

It is obvious from the record before this court that plaintiff was furnished with defective lesson unit scripts, that plaintiff notified defendant's contracting officer of this fact on numerous occasions after plaintiff commenced performance of the contract, and that defendant's repeated denials of responsibility for having furnished defective GFP was unreasonable and contrary to its obligations under the contract,

forcing plaintiff, in order to protect its interests, to file a properly certified claim with the CO. Defendant, in support of its motion to dismiss, has failed to establish that plaintiff's REA, filed on March 28, 1986, after many months of negotiation *during which defendant never retreated from its denial of defects in the scripts,* was not in any material respects compliant with the CDA and the Disputes clause of the contract. Although plaintiff's filing was styled "Request For Equitable Adjustment," the court concludes that it sought a final decision of the contracting officer, was for a sum certain, requested specific relief, asserted specific rights, and was initially treated by defendant as a properly certified claim which complied with the requirements of the CDA and the Disputes clause of the contract.

Accordingly, the court denies defendant's motion to dismiss. The parties shall file a joint status report within 15 days from the date of this decision proposing to the court a schedule of further proceedings.

No costs.

IT IS SO ORDERED.

