**JOHN MASSMAN CONTRACTING COMPANY and St. Paul Fire and Marine Insurance Company, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 92–203C.**

United States Court of Federal Claims.

May 7, 1993.

---

Charles F. Seemann, Jr., New Orleans, LA, with whom was Bernard A. Reinert, St. Louis, MO, for plaintiffs. Gordon Gaebler, Kansas City, MO, of counsel.

John P. Sholar, Washington, DC, with whom was Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, and Mary S. Mitchelson, for defendant. Lanny R. Robinson, U.S. Army Corps of Engineers, of counsel.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on defendant's motion for partial dismissal and for partial summary judgment. For the reasons set forth below, the court grants in part and denies in part defendant's motion.

### FACTS [1]

On December 12, 1984, Contract No. DACW38–85–C–0020 (the contract) was awarded to plaintiff John Massman Contracting Company (Massman) by the United States Army Corps of Engineers (the Corps) in the amount of $8,202,980.00 for Lorran Lake Realignment, Avoyelles and Catahoula Parishes, Louisiana. Plaintiff St. Paul Fire and Marine Insurance Company (St. Paul) is an insurance company which issued payment and performance bonds on the contract. Defendant was the obligee on the bonds, and Massman the principal. Under its payment bond, St. Paul made payments totalling over $2.5 million to Massman's subcontractors for labor and materials furnished in prosecution of the contract.

The contract required the realignment of the Red River between Miles 34.4 and 37.0 by construction of a pilot channel and a system of revetments and dikes. In order to divert all flows down the pilot channel, the contract required Massman to construct a closure dam across the old river

---

1. Plaintiffs do not dispute the facts contained in defendant's proposed findings of uncontroverted fact, yet succeed in raising genuine issues of material fact as to defendant's motion for partial summary judgment.

channel to elevation 60.5 NGVD.[2] The closure dam was to be located at approximate river Mile 36.3 and was to be constructed of earthen fill material by land-based equipment.

Several contract clauses are implicated in the parties' dispute. Contract Special Clause 13, ORDER OF WORK, (SC–13), provided:

Work on each structure or portion thereof shall begin at the upstream end and continue progressively downstream unless otherwise directed in writing by [the] Contracting Officer except as specified in [Clause] 6–3.1. With the exception of the pilot channel, work will not be permitted at river stages higher than 5–feet above the average low water plane for revetments and dikes placed in the river and a +5 ALWP water surface elevation in the trenchfill excavation without written permission of the Contracting Officer....

Contract Special Clause 17, DAMAGE TO WORK (MAR 1966 OCE), (SC–17), provided:

The responsibility for damage to any part of the permanent work shall be as set forth in the clause of the contract entitled "Permits and Responsibilities." However, if, in the judgment of the Contracting Officer, any part of the permanent work performed by the Contractor is damaged by flood, or earthquake, which damage is not due to the failure of the Contractor to take reasonable precautions or to exercise sound engineering and construction practices in the conduct of the work, the Contractor will make the repairs as ordered by the Contracting Officer and full compensation for such repairs will be made at the applicable contract unit or lump sum prices as fixed and established in the contract....

Contract Clause 43, DISPUTES (1984 APR) FAR 52.233–1, provided:

(a) This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601–613) (the Act).

(b) Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

. . . .

(h) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer.

Contract Clause 48, PERMITS AND RESPONSIBILITIES (1984 APR) FAR 52.-236–7, provided:

The contractor shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire work, except for any completed unit of work which may have been accepted under the contract.

Contract Clause 64, DEFAULT (FIXED–PRICE CONSTRUCTION) (1984 APR) FAR 52.249–10, provided:

(a) If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed. In this event, the Government may take over the work and complete it by contract or otherwise, and may take possession of and use any materials, appliances, and plant on the work site necessary for completing the work. The Contractor and its sureties shall be liable for any damage to the Government resulting from the Contractor's refusal or failure to complete the work within the specified time, whether or not the Contractor's right to proceed with the work is terminated. This liability includes any increased costs incurred by the Government in completing the work.

**2.** "NGVD" refers to the National Geodetic Vertical Datum, which is a means of measuring vertical feet above a fixed point, similar to mean sea level.

(b) The Contractor's right to proceed shall not be terminated nor the [C]ontractor charged with damages under this clause, if—

(1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor.... [S]uch clauses include (i) acts of God ... (ii) acts of the Government in either its sovereign or contractual capacity ... (v) floods ... (x) unusually severe weather ...; and

(2) The Contractor, within 10 days from the beginning of any delay (unless extended by the Contracting Officer), notifies the Contracting Officer in writing of the causes of delay....

The contract originally contemplated completion within 650 calendar days, establishing a completion date of October 27, 1986. Excusable weather and/or river stage delays, caused by river stages higher than the maximum permissible under SC–13 for work to be performed, plus additional work and variations in estimated quantities, resulted in 1,044 days of time extension and a revised completion date of September 5, 1989.

During the period from August 15, 1988, through mid-December 1988, Massman partially constructed the closure dam to approximate elevation 42 NGVD. Massman did not finish construction of the closure dam prior to the onset of wet weather in December 1988. When Massman ceased work, approximately 60,885 cubic yards of fill remained to complete the closure dam to 60.5 NGVD, the elevation required under the contract. During high water periods in 1989, the partially completed closure dam was overtopped and sustained damage. The overtopping damaged the uncompleted closure structure by washing out fill embankment which Massman had previously placed there. The upstream stone revetment was also damaged.

By letter dated June 30, 1989, Massman advised the Corps that it believed the damage to the partially completed closure dam was the result of a flood, and was therefore compensable under the contract's Damage to Work clause, SC–17. However, the June 30 letter did not state that Massman had incurred any costs as a result of the flood, was not described as a claim, did not request a final decision of the contracting officer, and was not certified. In response, the Corps informed Massman by letter dated July 10, 1989, that the Corps believed that a flood had not occurred because the river had not reached the flood stage at the Acme, Louisiana gauge. The Corps took the position that the provisions of SC–17 were inapplicable. The July 10, 1989 letter also informed Massman that a meeting would be useful prior to Massman's resumption of work, and that Massman would be notified when the river stage would allow work to resume.

By letter dated July 21, 1989, the Corps notified Massman that it would be expected to return to work when the river stage dropped to approximately 20 feet, which was anticipated in late August or early September 1989. In addition, the letter again advised Massman that the Corps believed a flood had not occurred, and that SC–17 was inapplicable. By letter dated August 8, 1989, the Corps informed Massman that the Acme, Louisiana gauge had dropped to 25.2 feet as of August 7, 1989, and that it should commence work as soon as the gauge reached 20 feet. Because commencement of work required preparation, the Corps directed Massman to contact the Corps' Area Office no later than August 12, 1989, to coordinate its plan to proceed.

At a meeting with the Corps' Area Engineer on August 15, 1989, Massman's representatives orally advised the Corps that Massman could not return to work without additional compensation for repair to the closure dam. At a meeting with the contracting officer on August 22, 1989, Massman again orally advised the Corps that it would not resume work due to financial constraints unless the Corps recognized that repair work was compensable. By letter dated September 1, 1989, the contracting officer advised Massman that he did not believe that repair to the closure dam qualified for compensation under SC–17; that Massman was still required to

proceed with work under the contract; that failure to proceed would indicate an abandonment of the project; and that failure to return to work would be grounds for termination for default under Contract Clause 64. The contracting officer provided Massman ten days to begin performance under the contract.

Massman did not resume work within ten days of receipt of the September 1, 1989 letter, as directed. During September 1989, Massman's representatives indicated to the Corps that Massman was attempting to make arrangements with its surety to resume work. When the Corps received no further communication that Massman would resume work, the contracting officer sent Massman a telex on September 27, 1989, directing it to respond in writing by September 29, 1989, whether it would resume work as directed. When no satisfactory response was received, the Corps advised Massman by telex dated October 5, 1989, that it was exercising its rights to terminate the contract for default as a result of Massman's abandonment and failure to proceed with the work as directed by the contracting officer. The October 5 telex was followed by the contracting officer's final decision, dated November 6, 1989, terminating the contract for default.

On November 6, 1990, Massman filed a complaint in the United States Claims Court seeking a declaratory judgment converting its termination for default to a termination for convenience of defendant, and awarding it demobilization costs in the amount of $80,000. As grounds for conversion to a convenience termination, Massman asserted that the damage to the partially completed closure dam was the result of a compensable flood. Prior to the date that this complaint was filed with the court, no claims had been presented to the contracting officer. On February 15, 1991, Massman voluntarily dismissed the November 6 complaint.

By letter dated February 5, 1991, Massman requested that the contracting officer reconsider his previous decision of November 6, 1989, terminating the contract for default, and convert the termination to one for convenience of defendant. By letter dated February 15, 1991, Massman amended its February 5, 1991 letter to add its request for a final decision on the $80,000 in demobilization costs.[3] Neither letter purported to be a properly certified claim under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988 & Supp. III 1991) (CDA). By letter dated March 4, 1991, the contracting officer responded to Massman's February 5 and February 15, 1991 letters, informing Massman that the only basis for the November 6, 1989 decision terminating the contract for default was Massman's abandonment of the work and failure to proceed when directed to do so. The contracting officer also informed Massman that the November 6, 1989 decision did not address damages sustained by the Corps or the excess costs of completing the work. Massman was advised that the process of determining those costs was nearing completion and that following completion of the assessment, the Corps would make a demand for such costs.

By letter dated March 26, 1991, the contracting officer notified Massman that the reprocurement contract was complete. The Corps determined that the excess costs of reprocurement and liquidated damages, less the amount still owed Massman under the contract, totalled $744,659.50. Massman was advised that payment of this amount or a response to the demand was expected within 30 days from receipt of the letter. The contracting officer did not receive payment or any other response from Massman. The contracting officer thus issued a final decision dated August 30, 1991, assessing excess costs of reprocurement and liquidated damages as a result of Massman's termination for default in the amount of $744,659.50.

Massman did not remit payment, and did not submit any claim to the contracting

---

**3.** On March 14, 1990, Massman had requested payment in the amount of $80,000 for demobilization costs incurred. The contracting officer denied this request on April 2, 1990. Massman has not asserted that its March 14, 1990 payment request was a certified claim for the contracting officer's final decision, nor was the contracting officer's response a final decision.

officer under the Disputes clause of the contract. On March 24, 1992, plaintiffs filed their present complaint. Plaintiffs seek a declaratory judgment converting Massman's termination for default into a termination for convenience, and a reversal of the contracting officer's decision assessing excess reprocurement costs and liquidated damages; alternatively, they seek a reduction in defendant's assessment of excess costs. Plaintiffs also seek the payment of, or credit against, defendant's assessment of sums paid by St. Paul to one of Massman's subcontractors. On June 8, 1992, defendant filed a counterclaim in this litigation against plaintiffs seeking an award of its excess reprocurement costs and liquidated damages in the amount of $744,659.50, plus interest.

## DISCUSSION

In its November 23, 1992 motion for partial dismissal and for partial summary judgment, defendant argues that it is entitled to judgment on plaintiffs' appeal challenging Massman's termination for default because plaintiffs' allegations of compensable flooding did not excuse Massman's failure to proceed and because the Damage to Work clause of the contract required Massman to perform repairs before seeking compensation. Defendant next argues that the court lacks jurisdiction over plaintiffs' claims for money damages and for certain reductions in penalties assessed against them because plaintiffs' claims have not been submitted to the contracting officer for a final decision. Plaintiffs oppose the motion by seeking to justify Massman's cessation of work on the grounds of financial inability to perform.

## I. MOTION FOR PARTIAL DISMISSAL

■ In considering defendant's motion for partial dismissal for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the court must accept as true any undisputed allegations of fact made by the non-moving party. *Reynolds v. Army &*

*Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). When disputed facts relevant to the issue of jurisdiction exist, the court may decide those questions of fact. *Id.; Hedman v. United States*, 15 Cl.Ct. 304, 306 (1988). When subject matter jurisdiction is questioned, the non-moving party bears the burden of establishing the court's jurisdiction. *Reynolds*, 846 F.2d at 748. This, plaintiffs have not done.

### A. *Demobilization Costs Claim*

■ As part of their request for a conversion of termination for default into termination for convenience, plaintiffs claim they are entitled to $80,000 in demobilization costs. As an affirmative claim for money damages, the claim must be dismissed for lack of subject matter jurisdiction under RCFC 12(b)(1).

The CDA requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a); *see* Contract Clause 43(d). For claims in excess of $50,000, the contractor must certify that the claim is made in good faith and is accurate. *See* 41 U.S.C. § 605(c)(1); Contract Clause 43(d)(2). Lack of proper certification deprives the contracting officer and the court of jurisdiction to proceed on the claim. *Tecom, Inc. v. United States*, 732 F.2d 935, 937 (Fed.Cir.1984); *W.M. Schlosser Co. v. United States*, 705 F.2d 1336, 1338–39 (Fed.Cir.1983). Otherwise, no particular magic language or format is required to create a claim over which this court has jurisdiction. The only requirement "is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987) (citing *Tecom*, 732 F.2d at 936–37; *Metric Constr. Co. v. United States*, 1 Cl.Ct. 383, 392 (1983)).[4]

---

**4.** The prerequisites for jurisdiction have been further articulated to include the following additional elements: (1) a letter to the contracting officer specifying the relief desired; (2) an assertion of specific rights; (3) a request for a final decision from the contracting officer; (4) a

The contracting officer's November 6, 1989 final decision did not address plaintiffs' claim for demobilization costs, nor was the contracting officer asked to do so. Massman's February 15, 1991 letter purportedly requesting a final decision on this claim has never been certified. Therefore, the court lacks jurisdiction to adjudicate the claim. *Tecom*, 732 F.2d at 937; *W.M. Schlosser Co.*, 705 F.2d at 1338–39.

### B. *Low Water Delay Claim*

Plaintiffs' claim for an unspecified reduction in liquidated damages because of delays related to unusually low water during 1987 must likewise be dismissed for lack of subject matter jurisdiction. This claim has not been presented to the contracting officer for a final decision pursuant to 41 U.S.C. § 605(a). This finding is made after careful consideration of the law of notice articulated in *Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1578 (Fed. Cir.1992). Thus, the court is deprived of jurisdiction. *AAI Corp. v. United States*, 22 Cl.Ct. 541, 544 (1991) (citing *Paragon Energy Corp. v. United States*, 645 F.2d 966, 976, 227 Ct.Cl. 176 (1981); *SMS Data Prods. Group, Inc. v. United States*, 19 Cl.Ct. 612, 614 (1990); 41 U.S.C. §§ 605(a), 609(a)(1) (1988)).

### C. *Dredging of Siltation Claim*

Plaintiffs seek an unspecified amount for St. Paul's payment to T.L. James & Company, a Massman subcontractor, for its dredging of siltation in parts of the pilot channel. Plaintiffs claim that defendant ordered this subcontractor to conduct the dredging without compensation upon defendant's "arbitrary and capricious" contract interpretation. This claim must also be dismissed for lack of subject matter

jurisdiction, as it has not been presented to the contracting officer for a final decision. *Id.; see Transamerica*, 973 F.2d at 1578.

In sum, these claims are all affirmative claims for money damages. As such, they must have been presented to the contracting officer for final decision—and properly certified where necessary—for jurisdiction to lie with this court. Plaintiffs have not even contended that these claims were submitted to the contracting officer. Moreover, their opposition to defendant's motion does not respond to defendant's allegations of jurisdictional deficiency. Because plaintiffs have not borne their burden of establishing the court's jurisdiction in the face of defendant's challenge, the court must dismiss these claims.[5]

## II. MOTION FOR PARTIAL SUMMARY JUDGMENT

■ The claims remaining are plaintiffs' request for conversion to termination for convenience and reversal of the contracting officer's decision assessing excess reprocurement costs and liquidated damages against them, and their alternative claim for a reduction in these costs and damages. Both claims are the subject of final decisions of the contracting officer. Defendant has moved for summary judgment on the issue of plaintiffs' termination for default.

Summary judgment under RCFC 56(c) is properly granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). In considering a motion for summary judgment, the evidence must be viewed, and inferences drawn, in a light

final decision of the contracting officer or the failure to issue such a decision within the statutory time periods; and (5) a clear indication of the amount of monetary compensation requested. *Cubic Corp. v. United States*, 20 Cl.Ct. 610, 616–17 (1990); *Mendenhall v. United States*, 20 Cl.Ct. 78, 82–83 (1990). Moreover, there is authority suggesting that a claimant should indicate the statutory basis for jurisdiction in this court, the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988 & Supp. III 1991). *See*

*Hoffman Constr. Co. v. United States,* 7 Cl.Ct. 518, 526 (1985).

5. The claims which are subject to dismissal for lack of subject matter jurisdiction are those set forth in ¶ 14(G) of Count I (entitlement to $80,-000 in demobilization costs); ¶ 18 of Count II (delays caused by alleged low water in 1987); and Count III (sums paid out by St. Paul for subcontractor's siltation dredging).

most favorable to the non-moving party. *Litton Indus. Prod., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir. 1985); *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1146 (Fed.Cir.1983). However, summary judgment is disfavored in situations where the non-moving party has not been afforded an opportunity to conduct discovery. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514–15.

The facts are clear that Massman ceased work in December 1988, and refused to resume work, as required, in August 1989. Massman did so in contravention of several contract clauses, e.g., Special Clause 1, Contract Clauses 43(h), 48. However, plaintiffs have raised genuine issues of material fact as to the causes of Massman's cessation of work and repudiation of the contract, and whether those causes justify the cessation such that the termination for default must be converted into termination for convenience of defendant. Such issues of material fact naturally raise questions about plaintiffs' alternative claim for a reduction in the excess reprocurement costs and liquidated damages assessed against them.

Because there are genuine issues of material fact, summary judgment is inappropriate. That neither party has conducted formal discovery in the instant case is an additional factor leading the court to conclude that to grant defendant's motion for partial summary judgment at this juncture would be premature. Therefore, both plaintiffs' claims for declaratory judgment converting Massman's termination for default into one for convenience, and for a reduction in excess reprocurement costs and liquidated damages assessed against them remain in issue.

## CONCLUSION

The court grants in part and denies in part defendant's motion. The Clerk of the court is directed to dismiss those portions of plaintiffs' complaint set out in note 5, *supra*, without prejudice.

The parties are directed to file a joint status report within thirty days advising the court on how they wish to proceed with the case in light of this order. Such report shall include an account of the status of settlement negotiations, and a proposed discovery schedule.

IT IS SO ORDERED.